2002 UT 89

**John W. (Jack) GALLIVAN, an individual; Michael D. Gallivan, an individual; Frank R. Pignanelli, an individual; Phyllis Sorenson, an individual; Susan M. Kuziak, an individual; and Linda Sue Dickey, an individual, Petitioners,**

v.

**Olene WALKER, in her official capacity as Lieutenant Governor of the State of Utah, Respondent.**

No. 20020545.

Supreme Court of Utah.

Aug. 26, 2002.

---

Lisa Watts Baskin, Salt Lake City, for petitioners John Gallivan, Phyllis Sorenson, Susan Kuziak, Linda Dickey.

Deno G. Himonas, John A. Pearce, Salt Lake City, for petitioners Michael Gallivan, Frank Pignanelli.

Mark L. Shurtleff, Att'y Gen., Thomas D. Roberts, Asst. Att'y Gen., for Lieutenant Governor.

David Jordan, Mark E. Hindley, Marc T. Rasich, Salt Lake City, for intervenors Gene Davis, Peter Knudsen, Howard Stephenson, Michael Waddoups, James Gowans, Utahns Against Unfair Taxes.

M. Gay Taylor, Salt Lake City, for amicus Utah Legislature.

RUSSON, Justice:

¶ 1 John W. (Jack) Gallivan, Michael D. Gallivan, Frank R. Pignanelli, Phyllis Sorenson, Susan M. Kuziak, and Linda Sue Dickey (collectively, "Gallivan") seek an extraordinary writ from this court requesting the following relief: (1) a declaration that Utah's multi-county signature requirement for placing an initiative on the ballot is unconstitutional, (2) a declaration that their initiative petition was sufficient under Utah Code section 20A–7–207(2), and (3) an order compelling respondent Lieutenant Governor Olene Walker ("lieutenant governor") to accept and file the petition and to place the initiative on the 2002 general election ballot. *Gallivan v. Walker*, 2002 UT 73, ¶ 1, 54 P.3d 1066. We grant the extraordinary writ and order the lieutenant governor to accept and file the petition and place the initiative on the 2002 general election ballot.

## BACKGROUND

¶ 2 The facts underlying and relevant to this petition for an extraordinary writ are undisputed.[1] Certain citizens of the State of Utah sponsored a proposed initiative known as the Radioactive Waste Restrictions Act (the "initiative") to be placed on the 2002 general election ballot. The sponsors of the proposed initiative included petitioners Mi-chael Gallivan, Frank R. Pignanelli, Phyllis Sorenson, and Susan M. Kuziak.

¶ 3 On April 10, 2002, the proposed initiative was filed with the lieutenant governor. On April 15, 2002, the lieutenant governor approved the initiative for circulation and issued circulation sheets in conformity with Utah Code section 20A–7–204. On or after April 15, 2002, the initiative's sponsors printed initiative packets and the sponsors commenced the circulation process of soliciting registered voters' signatures to obtain a sufficient number of signatures to have the initiative placed on the 2002 general election ballot.

¶ 4 To qualify the initiative for placement on the statewide ballot, the sponsors were required to obtain a specific number of signatures statewide and in each of more than two-thirds of the state's counties. To satisfy the statewide signature requirement,

> [a] person seeking to have an initiative submitted to a vote of the people for approval or rejection shall obtain:
>
> (i) legal signatures equal to 10% of the cumulative total of all votes cast for all candidates for governor at the last regular general election at which a governor was elected . . . .

Utah Code Ann. § 20A–7–201(2)(a)(i) (Supp. 2001). Pursuant to this requirement, the lieutenant governor determined that the sponsors were required to obtain a statewide minimum of 76,180 certified signatures in order to qualify the initiative for placement on the ballot.

¶ 5 In addition, to get the initiative placed on the ballot, the initiative's sponsors had to satisfy a multi-county distribution requirement: The sponsors had to obtain signatures from registered voters in each of at least 20 of Utah's 29 counties equal to 10 percent of all the votes cast for governor during the last gubernatorial election in the respective county in which the votes for governor were cast. *Id.* § 20A–7–201(2)(a)(ii) (Supp.2001). Spe-

---

1. Indeed, in her brief, the lieutenant governor did not present any facts, ostensibly concurring with the facts presented by Gallivan, and none of the parties in interest has refuted any facts presented to us that are relevant to the disposition of this case.

cifically, this multi-county signature requirement provides that the sponsors must obtain from each of at least 20 counties, legal signatures equal to 10% of the total of all votes cast in that county for all candidates for governor at the last regular general election at which a governor was elected. *Id.*

¶ 6 Between April 15 and June 1, 2002, the initiative's sponsors obtained over 130,000 signatures, purportedly the largest number of signatures ever gathered during the circulation of an initiative petition in Utah. On June 3, 2002,[2] the initiative's sponsors delivered the signed and verified initiative packets to each of the county clerks of the counties in which the respective initiative packets were circulated.

¶ 7 By July 1, 2002, the county clerks were required to verify that the signers are registered voters, certify on the petition that each signature is that of a registered voter, and deliver all of the packets to the lieutenant governor. *Id.* § 20A–7–206(3) (Supp.2001). From June 1 until the date on which each of the county clerks sent the petitions to the lieutenant governor, Utah law permitted voters that signed the initiative petition to remove their signatures from the petition. *Id.* § 20A–7–205(3)(a) (Supp.2001).

¶ 8 After the sponsors delivered the packets to the county clerks, opponents of the initiative, including Utahns Against Unfair Taxes, began contacting the petition signers to encourage them to remove their signatures from the petition. This campaign focused on signers residing in Utah's rural, sparsely populated counties, where fewer signature removals were required to cause the number of remaining signatures to fall below the number required in the county pursuant to the multi-county signature requirement.

¶ 9 Before the county clerks sent the signatures to the lieutenant governor, a sufficient number of signers from rural counties, approximately 3,000, removed their signatures from the initiative petition, thus disqualifying the initiative from being placed on the ballot for failure to satisfy the multi-county signature requirement. In fact, after the signatures were removed, the sponsors satisfied the multi-county signature requirement in only 14 of Utah's 29 counties, 6 counties short of the required 20.

¶ 10 The aggregate population of the 14 counties in which the sponsors satisfied the multi-county signature requirement is 87.14 percent of the state's overall population. Comparatively, the aggregate population of the other 15 counties is less than 13 percent of the state's total population. In addition, more than three-fourths of the state's population is concentrated in the 4 Wasatch Front counties of Weber, Davis, Salt Lake, and Utah. Indeed, if the sponsors had obtained only a combined 147[3] additional signatures in 6 specific counties of the 15 counties in which the sponsors did not satisfy the individual county requirement (Beaver, Daggett, Garfield, Kane, Piute, and Wayne)—in which only 21,651 people, or less than one percent of the state's overall population, reside—then the sponsors would have satisfied the multi-county signature requirement.

¶ 11 Even after the names were removed under Utah Code section 20A–7–205(3)(a), the state's county clerks certified and delivered an aggregate statewide total of 95,974 signatures of registered voters to the lieutenant governor, satisfying the statewide minimum 10 percent signature requirement of 76,180. Despite exceeding the statewide 10 percent requirement, on July 5, 2002, the lieutenant governor declared the initiative petition to be legally insufficient to be placed on the ballot because the sponsors failed to meet the multi-county signature requirement of Utah Code section 20A–7–201(2)(a)(ii).

¶ 12 On July 16, 2002, Gallivan petitioned this court for an extraordinary writ pursuant to Utah Code section 20A–7–207(4).

---

2. Although Utah law requires the sponsors to deliver the packets to the county clerks by June 1, Utah Code Ann. § 20A–7–206(1) (Supp.2001), Gallivan notes that the packets were delivered on June 3 because June 1 was a Saturday. None of the parties contends that this was improper or that it in any way impacts the outcome of this petition for an extraordinary writ or the placement of the initiative on the ballot.

3. This number represents 1/15,000th of the state's total population.

In the petition, Gallivan contends that Utah's multi-county signature requirement is unconstitutional under (1) the equal protection clause of the Fourteenth Amendment to the United States Constitution, (2) the uniform operation of laws provision of article I, section 24 of the Utah Constitution, and (3) the free speech clauses of the First Amendment to the United States Constitution and article I, section 15 of the Utah Constitution.[4] Gallivan argues that the multi-county signature requirement is unconstitutional because it discriminates against registered voters residing in urban counties and that the removal provision exacerbates that discrimination by permitting just a few registered voters living in rural, less populated counties to remove their signatures from the petition to thwart an entire statewide initiative petition.

¶ 13 In addition to a brief filed by the lieutenant governor in opposition to Gallivan's petition for an extraordinary writ, we permitted Gene Davis, Peter C. Knudson, Howard A. Stephenson, Michael G. Waddoups, James R. Gowans, and Utahns Against Unfair Taxes (collectively, "intervenors") to file a brief opposing Gallivan's petition, and we permitted the Utah Legislature to file an amicus curiae brief relating to Gallivan's petition.

¶ 14 In her brief, the lieutenant governor argues that the multi-county signature requirement burdens neither Gallivan's free speech rights nor Gallivan's equal protection rights, that the multi-county signature requirement is sustainable as a general initiative regulation, and that the purposes of the multi-county signature requirement justify it. Further, the lieutenant governor contends that if the multi-county signature requirement is unconstitutional, then the requirement is not severable from the rest of the initiative enabling statute and that therefore the entire statute would have to be struck down as unconstitutional.

¶ 15 Intervenors contend[5] that the multi-county signature requirement is a reasonable, and therefore a constitutional, implementation of Utah's initiative process, that the multi-county signature requirement does not implicate Gallivan's free speech rights, and that even if the multi-county signature requirement is unconstitutional—which they contend it is not—the requirement is not severable from the statewide 10 percent signature requirement, thereby precluding this court from granting Gallivan the remedy Gallivan seeks in the petition for an extraordinary writ to have the initiative placed on the ballot.

---

4. The dissent contends that "Petitioners have presented this court with a facial challenge to the use of any non-population based geographic distribution requirement in the initiative process [and that therefore] [t]o succeed, Petitioners must demonstrate that no circumstances exist under which such requirement can be found constitutional." This misstates and mischaracterizes Gallivan's constitutional challenge in this case. Gallivan makes a facial challenge specifically to the multi-county signature requirement, Utah Code Ann. § 20A–7–201(2)(a)(ii), in the initiative enabling statute. Gallivan does not challenge the use of "*any* non-population based geographic distribution requirement" as the dissent suggests, but instead, the actual geographic distribution requirement codified in the statute. Therefore, in order successfully to make a facial challenge to the multi-county signature requirement, Gallivan must demonstrate that no circumstances exist under which *this* requirement can be found constitutional. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (stating that in facial challenge, "the challenger must establish that no set of circumstances exist under which the Act would be val-

id"). Under *Salerno*, Gallivan is not required to show that any form of a statute requiring a geographic distribution requirement would be unconstitutional, but rather Gallivan must show that the specific requirement at issue, *the multi-county signature requirement*, is facially unconstitutional. As discussed below, the multi-county signature requirement is unconstitutional on its face because in every instance and under every circumstance it violates the uniform operation of laws provision of the Utah Constitution and the Equal Protection Clause of the United States Constitution.

5. Originally, intervenors also contended that we do not have original jurisdiction under Utah Code section 20A–7–207(4) to reach Gallivan's constitutional challenges. However, in *Gallivan v. Walker*, we decided that although we do not have jurisdiction under section 20A–7–207(4), we are treating this action as a petition for an extraordinary writ over which we have original jurisdiction pursuant to article VIII, section 3 of the Utah Constitution. 2002 UT 73 at ¶¶ 2–4, 54 P.3d 1066.

¶ 16 The legislature, in its amicus brief, endorsed the lieutenant governor's contentions that the multi-county signature requirement is constitutional under both the federal and state constitutions. Further, the legislature contends that the multi-county signature requirement of subsection (2)(a)(ii) of section 20A–7–201 cannot be severed from "the remainder of Subsection (2)(a) without severely distorting or altogether destroying legislative intent with respect to the numbers of voters required to place a statewide initiative on the ballot," that if this court declares any portion of the statute unconstitutional and severs it from the remainder, then this court would be unconstitutionally rewriting the statutory framework governing initiatives, and that therefore, if the multi-county signature requirement is unconstitutional, "the exclusive remedy should be to refer the statute back to the Legislature to make whatever modifications the Legislature determines appropriate." The legislature also contends that if the multi-county signature requirement is declared unconstitutional, a new timetable for the initiative process will have to be created and that the legislature, rather than this court, should set that timetable.

¶ 17 After oral argument, we issued an opinion in which we determined that we have original jurisdiction to consider this matter as a petition "for an extraordinary writ pursuant to article VIII, section 3 of the Utah Constitution." *Gallivan*, 2002 UT 73 at ¶ 4, 54 P.3d 1066. In that opinion, we solicited supplemental briefing and expedited the briefing process, *id.* at ¶¶ 5–6, requesting additional briefing from the parties on two questions: (1) What is or should be the standard for determining the freedom of expression and equal protection issues under the Utah Constitution? (2) What considerations affect the severability question when all portions of the initiative statute (the geographic distribution requirements, the percentage requirements, and the "signature rescission" provisions) are considered as a whole and separately?
*Id.* at ¶ 5.

¶ 18 Gallivan, in the supplemental brief, contends that the multi-county signature requirement is unconstitutional under the uni-

form operation of laws and free speech provisions of the Utah Constitution, regardless of whether the requirement is analyzed under heightened scrutiny or under less stringent scrutiny, although Gallivan maintains that heightened scrutiny is appropriate. Additionally, Gallivan contends that the multi-county signature requirement can be freely severed from the remainder of the statewide initiative statute.

¶ 19 Calling for a balancing test to determine which level of scrutiny should be applied to Gallivan's arguments under the Utah Constitution, the lieutenant governor contends that because any impact to Gallivan's fundamental rights relating to this case is not severe and is general, nondiscriminatory, and regulatory and because the state's interests in this case justify the multi-county signature requirement, it should be subjected to reasonable basis scrutiny and should be upheld. Similarly, intervenors contend that "the appropriate level of scrutiny [under the uniform operation of laws and free speech provisions of the Utah Constitution] is the lowest" in this case and that because the multi-county signature requirement passes constitutional muster under this level of scrutiny, the requirement should not be declared unconstitutional. Additionally, supplementing their contentions regarding severability, both the lieutenant governor and intervenors maintain that provisions of the initiative statute are not severable. Finally, intervenors contend that any challenge to the signature removal provision either is waived or has become moot.

## ANALYSIS

¶ 20 Gallivan petitions this court for an extraordinary writ, seeking to have the multi-county signature requirement of Utah Code section 20A–7–201(2)(a)(ii) declared unconstitutional and to have this court order the lieutenant governor to place the initiative on the 2002 general election ballot. Accordingly, we must review whether the multi-county signature requirement violates the uniform operation of laws provision of the Utah Constitution, the equal protection clause of the Fourteenth Amendment, and

the free speech clauses of both the United States and Utah Constitutions.

¶ 21 Before doing so, however, we must first explain how the people's right to legislate by initiative correlates with and functions in our constitutional state government system and how the legislatively created multi-county signature requirement relates to the implementation of the people's initiative right. Long ago, this court explained:

> [G]overnment . . . is an organization created *by* the people for their own purposes, to wit, for governmental purposes. As such, the government has powers [that] are strictly limited by the constitution. . . . The State of Utah . . . was conceived of dalliance between the Congress of the United States and the people of the Territory of Utah. The Congress passed an act, known as the Enabling Act, "to enable the people of Utah to form a constitution and State government." As a result thereof, the people of Utah conceived and gave birth to Siamese twins: A constitution and the State of Utah, inseparable unless both shall die.

*Duchesne County v. State Tax Comm'n*, 104 Utah 365, 375–76, 140 P.2d 335, 339–40 (1943) (quoting Enabling Act of July 16, 1894, ch. 138, Statutes at Large 107, *reprinted in* 1A Utah Code Ann. (1991)).

¶ 22 The government of the State of Utah was founded pursuant to the people's organic authority to govern themselves. The constitution crafted and ratified by the people of Utah unequivocally provides:

> *All political power is inherent in the people;* and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require.

Utah Const. art. I, § 2 (emphasis added); *see also Duchesne County*, 104 Utah at 376, 140 P.2d at 340.

 ¶ 23 In conformity with this principle, the Utah Constitution vests the people's sovereign legislative power in both (1) a representative legislature and (2) the people of the State, in whom all political power is inherent. Utah Const. art. VI, § 1(1) (Supp.2001); *see*

*also* Utah Const. art. I, § 2; *Duchesne County*, 104 Utah at 376, 140 P.2d at 340. Pursuant to article VI, section 1 of the Utah Constitution, the people exercise their direct legislative power through initiatives and referenda. Utah Const. art. VI, § 1. Article VI, section 1 is not merely a grant of the right to directly legislate, but reserves and guarantees the initiative *power* to the people. *Dewey v. Doxey–Layton Realty Co.*, 3 Utah 2d 1, 3, 277 P.2d 805, 806 (1954); *see also Shriver v. Bench*, 6 Utah 2d 329, 330 n. 1, 313 P.2d 475, 476 n. 1 (1957); *Halgren v. Welling*, 91 Utah 16, 21, 63 P.2d 550, 552 (1936) ("The right of direct legislation is in the people."); *Urevich v. Woodard*, 667 P.2d 760, 762 (Colo.1983) (en banc) (stating that initiative power under Colorado Constitution is " 'a reservation of power by [the people] for themselves' " (quoting *McKee v. City of Louisville*, 200 Colo. 525, 616 P.2d 969, 972 (1980))). The power of the legislature and the power of the people to legislate through initiative and referenda are coequal, coextensive, and concurrent and share "equal dignity." *Utah Power & Light Co. v. Provo City*, 94 Utah 203, 235–36, 74 P.2d 1191, 1205 (1937) (Larson, J., concurring) (stating that "by the initiative process [under the Utah Constitution] the people [are] a legislative body coequal in power and with superior advantages to the Legislature"); *see also Dewey*, 3 Utah 2d at 4, 277 P.2d at 807 (noting that electors' power to pass legislation via initiative is same as power of legislature); *accord Manduley v. Superior Court*, 27 Cal.4th 537, 117 Cal.Rptr.2d 168, 41 P.3d 3, 13 (2002); *Commonwealth v. Leno*, 415 Mass. 835, 616 N.E.2d 453, 457 (1993); *State ex rel. Goodman v. Stewart*, 57 Mont. 144, 187 P. 641, 643 (1920); *State ex rel. Stenberg v. Moore*, 258 Neb. 199, 602 N.W.2d 465, 474 (1999); *Wyo. Nat'l Abortion Rights Action League v. Karpan*, 881 P.2d 281, 285 (Wyo. 1994).

 ¶ 24 The reserved right and power of initiative is a fundamental right under article VI, section 1 of the Utah Constitution. *Shriver*, 6 Utah 2d at 332, 313 P.2d at 480; *see also Loonan v. Woodley*, 882 P.2d 1380, 1383–84 (Colo.1994) (en banc). For decades, we have recognized that the right to vote is a

fundamental right. *Pub. Employees' Ass'n v. State*, 610 P.2d 1272, 1273 (Utah 1980). Indeed,

> [n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

*Reynolds v. Sims*, 377 U.S. 533, 560, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

 ¶ 25 Initiative is the power of a voter to directly legislate via exercising the right to vote. *Stavros v. Office of Legislative Research & Gen. Counsel*, 2000 UT 63, ¶ 19, 15 P.3d 1013; *Halgren*, 91 Utah at 21, 63 P.2d at 552; *see also Shriver*, 6 Utah 2d at 330, 313 P.2d at 476. Like the right to vote generally, the initiative right guarantees participation in the political process. *Loonan*, 882 P.2d at 1383–84. It is a constitutionally guaranteed right that "form[s] an implicit part of the life of a free citizen in a free society."[6] *Pub. Employees' Ass'n*, 610 P.2d at 1273. The initiative right encourages political dialogue and allows the general populace to have substantive and meaningful participation in enacting legislation that impacts society. It is democracy in its most direct and quintessential form.

¶ 26 The voters' right to initiative does not commence at the ballot box: The voters' right to legislate via initiative includes signing a petition to get the proposed initiative on the ballot. Signing a petition is inextricably connected to the voters' right to vote on an initiative because it serves a gatekeeping function to the right to vote. Accordingly, "[t]he use of … petitions … to obtain a place on the [state's] ballot is an integral part of [its] elective system." *Moore v. Ogilvie*, 394 U.S. 814, 818, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). Recognizing that ballot access is essential to fundamental rights, the United States Supreme Court explained:

Restrictions on access to the ballot burden two distinct and fundamental rights, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."

*Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)). In essence, both the ability to commence the initiative process by signing a petition and the ultimate act of casting a vote on a proposed initiative are integral and correlative parts of a proposed initiative's "election process," *Moore*, 394 U.S. at 818, 89 S.Ct. 1493, that is, the right to cast a vote in the initiative context is dependent on the proposed initiative garnering sufficient signatures to qualify the proposed initiative for placement on the ballot. The right to vote on an initiative cannot exist without the voters' unfettered right to legislate through initiative, which necessarily begins with the circulating and signing process.

 ¶ 27 Because the people's right to directly legislate through initiative and referenda is sacrosanct and a fundamental right, Utah courts must defend it against encroachment and maintain it inviolate. *See Cope v. Toronto*, 8 Utah 2d 255, 259, 332 P.2d 977, 979 (1958) (per curiam) (noting that statute enabling people's right to initiative must be given construction that "effectuate[s] its purpose that the people be permitted to vote and express their will on proposed legislation"); *see also Legislature v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309, 1313 (1991) (en banc) ("[I]t is our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise."); *Associated Home Builders of Greater Eastbay, Inc. v. City of Livermore*, 18 Cal.3d 582, 135 Cal.Rptr. 41, 557 P.2d 473, 477 (1976) (en banc) (same); *Urevich*, 667 P.2d at 762 ("Any law that limits this 'fundamental right at the very core of our republi-

---

**6.** The United States Supreme Court has explained that fundamental rights are those that are "implicit in the concept of ordered liberty." *Palko v. State of Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *overruled on other grounds by Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

can form of government' is viewed with the closest scrutiny." (quoting *McKee*, 616 P.2d at 972)); *State ex rel. Stenberg v. Moore*, 258, Neb. 199, 602 N.W.2d 465, 474 (1999) (stating that right of initiative is "precious" and "is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter" (quotations omitted)); *In re Referendum Pet. No. 18, State Question No. 437*, 1966 OK 152, 417 P.2d 295, 297 ("The right to petition for a vote of the people by Initiative and Referendum provided by Art. 5, § 2, of the Constitution of Oklahoma is a sacred right to be carefully preserved."); *Bernstein Bros., Inc. v. Dep't of Revenue*, 294 Or. 614, 661 P.2d 537, 539 (1983) (holding that Oregon Supreme Court "has consistently defended [the people's powers of referendum and initiative] against any encroachment"). Because of the fundamental nature of the right of initiative and its significance to the political power of registered voters of the state, the vitality of ensuring that the right is not effectively abrogated, severely limited, or unduly burdened by the procedures enacted to enable the right and to place initiatives on the ballot is of paramount importance.

¶ 28 Article VI, section 1 requires the legislature to enact legislation to enable the people to exercise their reserved power and right to directly legislate through initiative. *See Owens v. Hunt*, 882 P.2d 660, 661 (Utah 1994). This section provides in pertinent part:

(2)(a)(i) The legal voters of the State of Utah in the numbers, under the conditions, in the manner, and within the time provided by statute, may:

(A) initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation . . . .

Utah Const. art. VI, § 1(2)(a)(i)(A) (Supp. 2001). Accordingly, the legislature can and is required to enact legislation that implements and enables the exercise of the people's right to initiative so long as it does not pass laws that unduly burden or diminish the people's right to initiate legislation. *See Owens*, 882 P.2d at 661 (acknowledging legislature's latitude in enacting initiative regulations that do not "discriminat[e]" or impose

"unreasonable restraint on rights of electorate" to legislate through initiative); *see also Loonan*, 882 P.2d at 1386–87 (stating that legislature's enactments that will diminish, impair, limit, or destroy constitutional initiative right are impermissible); *Wolverine Golf Club v. Hare*, 24 Mich.App. 711, 180 N.W.2d 820, 830 (1970) (noting that legislature can enact statutes that "place certain ground rules on the petitioning for initiative in order to facilitate the enormous task of verifying the signatures on petitions," but it cannot "create unnecessary obstacles to restrict the lawful use of initiative"); *Bernstein Bros., Inc.*, 661 P.2d at 539 ("The only power the legislature has is to pass legislation that aids or facilitates the [initiative power] intended by the constitution."); *cf.* Ark. Const. amend. 7 ("No legislation shall be enacted to restrict, hamper or impair the exercise of the right [of initiative] reserved to the people.").

¶ 29 Complying with this constitutional directive to enact enabling legislation, the Utah Legislature passed Utah Code sections 20A–7–201 to –213, which detail Utah's procedures for conducting statewide initiative elections. *See generally Bigler v. Vernon*, 858 P.2d 1390, 1391–92 (Utah 1993). The legislature, in setting the minimum number of signatures required for a proposed initiative to be placed on the ballot, requires the sponsors to obtain both a specific number of signatures statewide and a specific number of signatures in each of more than two-thirds of the state's counties. To satisfy the statewide signature requirement,

[a] person seeking to have an initiative submitted to a vote of the people for approval or rejection shall obtain:

(i) legal signatures equal to 10% of the cumulative total of all votes cast for all candidates for governor at the last regular general election at which a governor was elected . . . .

Utah Code Ann. § 20A–7–201(2)(a)(i) (Supp. 2001). To satisfy the multi-county signature requirement,

[a] person seeking to have an initiative submitted to a vote of the people for approval or rejection shall obtain:

. . . ;

(ii) from each of at least 20 counties, legal signatures equal to 10% of the total of all votes cast in that county for all candidates for governor at the last regular general election at which a governor was elected.

*Id.* § 20A–7–201(2)(a)(ii).[7] Having this backdrop in mind, we now turn to Gallivan's constitutional challenges to the multi-county signature requirement.

## I. EQUAL PROTECTION AND UNIFORM OPERATION OF LAWS

¶ 30 Gallivan challenges the multi-county signature requirement provision of the Utah initiative enabling statute, Utah Code Ann. § 20A–7–201(2)(a)(ii), on the grounds that it violates both the uniform operation of laws provision of the Utah Constitution, Utah Const. art. I, § 24, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1.

¶ 31 Article I, section 24 of the Utah Constitution states: "All laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. The Fourteenth Amendment to the United States Constitution prohibits a state from enacting laws that deny "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Despite their dissimilar language, these two constitutional provisions "embody the same general principle: persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same." *Malan v. Lewis,* 693 P.2d 661, 669 (Utah 1984); *see also Carrier v. Pro–Tech Restoration,* 944 P.2d 346, 355–56 (Utah 1997) (observing that Utah's uniform operation of laws provision and federal Equal Protection Clause "embody the same general principles"); *Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884, 888 (Utah 1988) (same); *Liedtke v. Schettler,* 649 P.2d 80, 81 n. 1 (Utah 1982)

**7.** Twenty-three states allow their citizens to legislate by initiative. Thirteen of those states, including Utah with the multi-county signature requirement, have some form of geographic distribution requirement. Those states are Alaska, Arkansas, Florida, Idaho, Massachusetts, Mississippi, Missouri, Montana, Nebraska, Ohio, Utah, and Wyoming.

Five of those 13 states—Alaska, Florida, Mississippi, Missouri, and Montana—use a population-based unit of geographic distribution, such as state house districts, state senate districts, or congressional districts. The remaining 8 states, including Utah, use nonpopulation-based units of geographic distribution, such as counties. Each of these states requires a certain percentage of signatures from each of a certain number, percentage, or fraction of the counties in the state to place an initiative on the ballot. *See* Ark. Const. amend. 7 (requiring 8 percent statewide with not less than 4 percent in at least 15 of 77 counties for enacting statutes by initiative); Idaho Code § 34–1805 (Michie 2000) (requiring 6 percent statewide with not less than 6 percent from each of 22 of 44 counties to place an initiative on the ballot); Mass. Const. Amend. art. XLVIII, Init., pt. 5, § 1 (1997) & Gen. Prov., pt. 2 (1997) (requiring 3.5 percent statewide with not more than one-fourth of the signatures from any one county, or requiring at least 4 of 14 counties to place an initiative on the ballot); Neb. Const. art. 3, § 2 (requiring 7 percent statewide with signatures distributed as to include 5 percent of registered voters from each of 37 of 93 counties to place an initiative on the ballot); Nev. Const. art.

19, § 2 (requiring 10 percent statewide with 10 percent or more from not less than 13 of 17 counties to place an initiative on the ballot); Ohio Const. art. II, §§ 1A & 1G (requiring signatures of 6 percent of registered voters voting in last gubernatorial election and signatures of one-half of those, or 3 percent, from each of 44 of 88 counties to place an initiative on the ballot); Utah Code Ann. § 20A–7–201 (Supp.2001) (requiring 10 percent statewide with not less than 10 percent from each of 20 of 29 counties to place an initiative on the ballot); Wyo. Const. art. 3, § 52(c) (requiring 15 percent statewide with not less than 15 percent from each of 15 of 23 counties to place an initiative on the ballot). It is worth noting that before the legislature amended Utah Code section 20A–7–201(2)(a)(ii) in 1998, Utah required only 10 percent in 15, rather than 20, of Utah's 29 counties. Utah Code Ann. § 20A–7–201(2)(a)(ii) (1995).

Only 3 of the 13 states incorporating a geographic distribution requirement—Alaska, Idaho, and Utah—do so by statute, and of those only Idaho and Utah use counties. Idaho's multi-county signature requirement, requiring signatures from only 6 percent of the registered voters in half of Idaho's 44 counties, was declared unconstitutional by the Federal District Court for the District of Idaho. *Idaho Coalition United for Bears v. Cenarrusa,* Civ. No. 00–0668–S–BLW, slip op. at 1, 9–10 (D.Idaho Nov. 30, 2001); *see infra* ¶ 76. The other 10 states incorporating a geographic distribution requirement do so expressly in the constitution of the state.

(stating that article I, section 24 is "generally considered the equivalent of the Equal Protection Clause of the 14th Amendment, U.S. Constitution").

¶ 32 Both constitutional provisions incorporate the "[b]asic principles of equal protection of the law [that] are inherent in the very concept of justice and are a necessary attribute of a just society." *Malan*, 693 P.2d at 670. That equal protection is "essential to a free society" is "explicitly stated ... in Article I, § 2 of the Utah Constitution: '[A]ll free governments are founded on their authority for [the people's] equal protection and benefit ....' "[8] *Id.* (alterations in original) (quoting Utah Const. art. I, § 2).

¶ 33 Even though there is a similitude in the "fundamental principles" embodied in the federal Equal Protection Clause and the Utah uniform operation of laws provision, "our construction and application of Article I, § 24 are not controlled by the federal courts' construction and application of the Equal Protection Clause," *Malan*, 693 P.2d at 670; *see also Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 426 (Utah 1995), and "[w]e have recognized that article I, section 24 ... establishes different requirements from the federal Equal Protection Clause." *Whitmer v. City of Lindon*, 943 P.2d 226, 230 (Utah 1997). In light of and because of these differences, we also have reiterated that Utah's uniform operation of laws provision is "at least as exacting and, in some circumstances, more rigorous than the standard applied under the federal constitution." *Mountain Fuel Supply Co.*, 752 P.2d at 889; *see also Carrier*, 944 P.2d at 356; *Whitmer*, 943 P.2d at 230. Thus, because "the language and history of the two provisions are entirely different, and even though there are important areas of overlap in the

concepts embodied in the two provisions," we have noted that "the differences can produce different legal consequences." *Lee v. Gaufin*, 867 P.2d 572, 577 (Utah 1993); *see also State v. Mohi*, 901 P.2d 991, 997 (Utah 1995) (citing *Lee* ); *Malan*, 693 P.2d at 670 ("The different language of Article I, § 24, the different constitutional contexts of the two provisions, and different jurisprudential considerations may lead to a different result in applying equal protection principles under Article I, § 24 than might be reached under federal law."). Consequently, we will address Gallivan's challenges to the multi-county signature requirement under each constitutional provision separately and in turn.

### A. Uniform Operation of Laws under Utah Constitution

¶ 34 Gallivan challenges the multi-county signature requirement provision of the initiative enabling statute, Utah Code Ann. § 20A–7–201(2)(a)(ii), on the ground that it violates the uniform operation of laws provision of the Utah Constitution, arguing that the multi-county signature requirement is unreasonable and disparate in its operation because it has the effect of heightening the relative weight of the signatures of registered voters in rural, less populous counties and diluting the weight of the signatures of registered voters in urban, more populous counties, thus impermissibly skewing in favor of rural registered voters the power to determine whether an initiative is placed on the ballot under the initiative process. Gallivan contends that the multi-county signature requirement neither is supported by nor furthers any valid or legitimate legislative purpose or objective and that the multi-county signature requirement is not reasonably necessary to further legitimate legislative goals. Because in Gallivan's view the challenged statutory provision impacts fundamental or

---

8. We have referenced either article I, section 24 or article I, section 2, or both, of the Utah Constitution as the wellsprings of our state equal protection principles. *See, e.g., Malan*, 693 P.2d at 670 n. 13; *Allen v. Intermountain Health Care, Inc.*, 635 P.2d 30, 31 & n. 10 (Utah 1981); *Redwood Gym v. Salt Lake County Comm'n*, 624 P.2d 1138, 1146 n. 27 (Utah 1981). Article I, section 2 uses the phrase "equal protection," but "although it is relevant to the construction of

Article I, § 24, it is more a statement of a purpose of government than a legal standard that can be used to measure the legality of governmental action." *Malan*, 693 P.2d at 670 n. 13. Nevertheless, article I, section 2 articulates a fundamental philosophical, political, and legal principle that underlies and informs our analysis under its companion uniform operation of laws article.

critical rights guaranteed by the Utah Constitution, Gallivan asserts that our review of the statute should employ a heightened scrutiny, giving little or no deference to the legislature and without affording the multi-county signature requirement provision the normal presumption of constitutionality.

¶ 35 The lieutenant governor and intervenors maintain that because no fundamental or critical right is at stake in connection with the statute and because the legislative purposes and goals underlying the statute are reasonable and legitimate and reasonably related to the classification in question, we should sustain the constitutionality of the multi-county signature requirement under the lowest or minimal level of scrutiny.

¶ 36 Article I, section 24 of the Utah Constitution states: "All laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. The essence of this constitutional provision is " 'the settled concern of the law that the legislature be restrained from the fundamentally unfair practice' of classifying persons in such a manner that those who are similarly situated with respect to the purpose of the law are treated differently by that law, to the detriment of some of those so classified." *Blue Cross & Blue Shield of Utah v. State*, 779 P.2d 634, 637 (Utah 1989) (quoting *Mountain Fuel Supply Co.*, 752 P.2d at 888).

¶ 37 In order for a law to be constitutional under the uniform operation of laws provision, "it is not enough that it be uniform on its face. What is critical is that the operation of the law be uniform." *Lee*, 867 P.2d at 577; *see also Mohi*, 901 P.2d at 997. "A law does not operate uniformly if 'persons similarly situated' are not 'treated similarly' or if 'persons in different circumstances' are 'treated as if their circumstances were the same.' " *Lee*, 867 P.2d at 577 (quoting *Malan v. Lewis*, 693 P.2d 661, 669 (Utah 1984)). In other words, "[w]hen persons are similarly situated, it is unconstitutional to single out one person or group of persons from among the larger class on the basis of a tenuous justification that has little or no merit." *Malan*, 693 P.2d at 671 (footnote omitted).

¶ 38 Therefore, the equal protection principle inherent in the uniform operation of laws provision protects against discrimination within a class and guards against disparate effects in the application of laws. *See id.* While the legislature may have discretion in the creation of classes to which legislation applies, " 'the court must determine whether such classifications operate equally on all persons similarly situated.' " *Id.* (quoting *State Tax Comm'n v. Dep't of Fin.*, 576 P.2d 1297, 1298 (Utah 1978)). Ultimately, it is the judiciary's province to decide the vital and determinative question of "whether a classification operates uniformly on all persons similarly situated within constitutional parameters." *Id.*

¶ 39 In conducting an analysis of a challenged statutory provision under article I, section 24, "the broad outlines of the analytical model used in determining compliance with the uniform operation of laws provision remain the same in all cases, [but] the level of scrutiny we give legislative enactments varies." *Blue Cross & Blue Shield*, 779 P.2d at 637; *see also, e.g., Peterson v. Coca–Cola USA*, 2002 UT 42, ¶ 23, 48 P.3d 941; *Lee*, 867 P.2d at 578–83; *Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 426 (Utah 1995); *Swayne v. L.D.S. Soc. Servs.*, 795 P.2d 637, 647 (Utah 1990) (Zimmerman, J., concurring and dissenting); *Mountain Fuel Supply Co.*, 752 P.2d at 888 n. 3; *Condemarin v. Univ. Hosp.*, 775 P.2d 348, 354–56, 373 (Utah 1989); *Condemarin*, 775 P.2d at 372–73 (Stewart, J., separate opinion).

¶ 40 Where a legislative enactment implicates a "fundamental or critical right" or creates classifications which are "considered impermissible or suspect in the abstract," we apply a heightened degree of scrutiny. *Ryan*, 903 P.2d at 426; *see also Peterson*, 2002 UT 42 at ¶ 23, 48 P.3d 941; *Swayne*, 795 P.2d at 647 (Zimmerman, J., concurring and dissenting); *Condemarin*, 775 P.2d at 373 (Stewart, J., separate opinion).

¶ 41 The starting point of our analysis, therefore, is whether the multi-county signature requirement of the initiative enabling statute implicates a "fundamental or critical right" or creates classifications which

are "considered impermissible or suspect in the abstract." *Ryan*, 903 P.2d at 426. The statutory provision at issue in this case impacts the right of the people to exercise their reserved legislative power and their right to vote. As we previously explained, both are fundamental and critical rights to which the Utah Constitution has accorded special sanctity. *See supra* ¶¶ 24–27.

 ¶ 42 Because the multi-county signature requirement affects fundamental and critical rights guaranteed by and reserved to the citizens of Utah in the Utah Constitution, we review the challenged law with heightened scrutiny and apply the following analytical model articulated in *Lee*:

> [A] ᵃ statutory classification that discriminates against a person's constitutionally protected [fundamental or critical] right ... is constitutional only if it (1) is reasonable, (2) has more than a speculative tendency to further the legislative objective and, in fact, actually and substantially furthers a valid legislative purpose, and (3) is reasonably necessary to further a legitimate legislative goal.

867 P.2d at 582–83. In other words, in order for a discriminatory classification to be constitutional it must be reasonably necessary to further, and in fact must actually and substantially further, a legitimate legislative purpose. *See id.*

 ¶ 43 Under this uniform operation of laws analytical model, our analysis is straightforward. Initially, we must address two threshold issues by determining (1) what, if any, classification is created and (2) whether that classification is discriminatory, that is, whether it treats the members of the class or subclasses disparately. *See Mohi*, 901 P.2d at 997. If a discriminatory classification exists, it must then be analyzed according to the *Lee* test to determine if it is constitutionally permissible. Under the *Lee* analysis, we review each of the stated legislative purposes supporting the multi-county signature requirement and determine whether that legislative purpose is legitimate, whether the multi-county signature requirement actually and substantially furthers that purpose, and whether the multi-county signature requirement is reasonably necessary to further the

legislative purpose. With this road map in hand, we return to the first of our two threshold issues.

 ¶ 44 First, the multi-county signature requirement of the initiative enabling statute requires that citizens wishing to have an initiative placed on the ballot must secure the signatures of registered voters residing in a particular county equal to 10 percent of the aggregate number of votes cast in that particular county for governor in the last gubernatorial election in each of 20 of Utah's 29 counties. Utah Code Ann. § 20A–7–201(2)(a)(ii) (Supp.2001). The classification made by the statutory provision, that is, the class of persons to which the statutory provision applies, is registered voters by requiring the signatures of such voters. *See id.* § 20A–7–201(2)(a). The effect of the operation of the multi-county signature requirement enacted by the legislature is the creation of two subclasses of registered voters: those who reside in rural counties and those who reside in urban counties. These subclasses, while not expressly created by the statute, result from the application and operation of the statute. The lieutenant governor and intervenors also implicitly acknowledge the existence of the two subclasses and the operation of the statute as to the two subclasses when they argue that the legislative purpose behind the multi-county signature requirement is, among other things, to counter localized legislation disfavoring rural counties and populations and to act as a check and balance on the urban majority.

 ¶ 45 Second, the question arises whether the classification created by the legislature is discriminatory, that is, whether the members of the class or subclasses are treated disparately. The multi-county signature requirement has the effect of diluting the power of urban registered voters and heightening the power of rural registered voters in relation to an initiative petition, thereby treating similarly situated registered voters disparately. Given Utah's uniquely concentrated population, the effect of the multi-county signature requirement is to allow registered voters in rural counties to wield a disproportionate amount of power in

the determination of whether an initiative qualifies to be placed on the ballot. The statutory scheme is discriminatory in that it essentially raises registered voters in rural counties to the level of gatekeepers who can effectively keep initiatives off the ballot despite the existence of significant numeric support for the initiative in urban portions of the state. Because more than three-fourths of Utah's population resides along the urbanized Wasatch Front, i.e., in Salt Lake, Utah, Weber, and Davis Counties, a relatively small number of registered voters in the rural, sparsely populated counties have an effective veto in the initiative process merely by virtue of residing in rural areas of the state. For example, a signature in Daggett County, whose population is 0.1 percent of Salt Lake County's population, is rendered 1000 times as valuable as the signature of a voter in Salt Lake County. The multi-county signature requirement does not apply equally to the subclasses of rural and urban registered voters and in effect creates a discriminatory classification because of its disparate impact.

¶ 46 Having determined that a discriminatory classification and disparate impact exist, we now must consider if that discriminatory classification is constitutionally permissible under the uniform operation of laws provision. To make this determination, we turn to *Lee's* analytical model. *See* 867 P.2d at 582–83.

¶ 47 The lieutenant governor and intervenors advance six purportedly legitimate legislative purposes that allegedly support the discriminatory classification in question and maintain that the multi-county signature requirement is reasonably necessary to further, and in fact actually and substantially furthers, those legislative purposes. The proffered legislative purposes are (1) "maintaining the integrity of the process" by ensuring that there is a "significant modicum of support throughout the state"; (2) ensuring that "initiatives are not so easy to get on the ballot"; (3) "promoting initiatives as grassroots legislation with geographical and popu-

lar support"; (4) "counter[ing] the possibility of localized legislation"; (5) "acting as a check and balance" to "temper majoritarian rule [and] safeguard minority interests"; and (6) "insur[ing] that there is an informed electorate." Gallivan responds that none of the suggested legislative purposes underlying the multi-county signature requirement is legitimate and that the multi-county signature requirement is not reasonably necessary to further those legislative goals in any event.

¶ 48 The primary or principal legislative purpose of the multi-county signature requirement offered by intervenors is that of ensuring statewide support for an initiative before it can be placed on the ballot.[9] According to this legislative purpose, in enacting the multi-county signature requirement, the legislature sought to ensure that only initiatives that have a sufficient modicum of support from registered voters throughout the state would ultimately be placed on the statewide general election ballot. In other words, the legislature sought to make certain that an initiative has broad geographically distributed statewide support before that initiative can be placed on the ballot. To this end, the legislature chose counties as the unit of geographic distribution.

¶ 49 The multi-county signature requirement is not a reasonably necessary means or mechanism to further the legislative purpose of ensuring broad geographic statewide support because it invidiously discriminates against urban registered voters in favor of rural registered voters in violation of the one person, one vote principle and overly burdens the constitutional right of initiative in that it is not the least restrictive means of furthering the stated legislative purpose. The multi-county signature requirement's use of counties as the geographic unit of distribution is the source of the invidious discrimination. Because counties have such widely varied populations, with the concentration of population being in 4 counties, the multi-county signature requirement's reli-

---

9. A few of the other proffered legislative goals or purposes, while offered independently, essentially are components, restatements, or subsets of the broader goal of requiring or ensuring statewide support. To some extent, they are sub-

sumed in the goal of statewide support, and our analysis of the primary purpose applies to those with equal force. In any event, we will address each stated goal independently.

ance on counties and the effect of its requiring signatures from 20 of 29 counties result in the discrimination in favor of the 25 rural counties over the 4 urban counties. It is not inconceivable that a less restrictive, burdensome, or nondiscriminatory mechanism for ensuring broad geographic statewide support could be crafted. Because the multi-county signature requirement is not a reasonably necessary means to further this intended legislative purpose, it does not pass constitutional muster under our uniform operation of laws provision. *See Lee*, 867 P.2d at 582–83.

■ ¶ 50 In addition, the multi-county signature requirement does not actually and substantially further the legislative purpose of ensuring statewide support, that is, broadly distributed geographic support, or of promoting initiatives regarding issues of statewide interest. The multi-county signature requirement has the opposite effect. By giving an effective veto to the rural minority over the urban majority, initiatives that enjoy statewide support from the majority of the population and therefore focus on issues of at least numerical statewide concern are prevented from qualifying for the ballot. In this respect, the multi-county signature requirement thwarts the placement on the ballot of widely supported initiatives. Effectively, only initiatives of rural concern and with rural support get placed on the ballot, thus defeating the use of the initiative process and purpose of statewide support. Therefore, the multi-county signature requirement with regard to purpose does not pass the *Lee* test because it does not actually and substantially further the stated legislative purpose of ensuring statewide support.

■ ¶ 51 The lieutenant governor also argues that the multi-county signature requirement is supported by the legitimate legislative purpose of ensuring that "initiatives are not so easy to get on the ballot." In other words, she argues that the legislature was justified in enacting the multi-county signature requirement because it makes it harder for citizens to exercise their right to legislate through the constitutionally guaranteed initiative process. This clearly is not a legitimate legislative purpose.

¶ 52 As we have previously explained, the initiative power and the citizens' right to legislate directly through the exercise of that power is a fundamental right guaranteed in the Utah Constitution. *See supra* ¶¶ 24–27. The legislature's purpose to unduly burden or constrict that fundamental right by making it harder to place initiatives on the ballot is not a legitimate legislative purpose. Endorsing this legislative purpose would essentially allow the legislature without limitation to restrict and circumscribe the initiative power reserved to the people, thus rendering itself the only legislative game in town. If such a legislative purpose were legitimate, the legislature would be free to completely emasculate the initiative right and confiscate to itself the bulk of, if not all, legislative power. This would obviously contravene both the letter and the spirit of article VI of the constitution.

■ ¶ 53 This is not to say that in some circumstances the legislature cannot impose restrictions that may, through their operation, make it more difficult to place an initiative on the ballot. The legislature can impose restrictions—such as requiring a particular form of petition, setting reasonable time frames to ensure the efficiency of the process, or requiring signers to be registered voters—which would have the effect of making it more difficult to get initiatives on the ballot, but only to the extent that those restrictions comport with article VI, section 1 of the Utah Constitution, do not violate other constitutional provisions, and further legitimate legislative purposes such as deterring fraud, ensuring the efficiency of the process, or ensuring a modicum of numerical support for an initiative. All of these legislative purposes could support restrictions on the initiative right that could, conceivably, have the effect of making it more difficult to place an initiative on the ballot and could be consistent with the provision of article VI, section 1 that requires the legislature to enact legislation enabling the initiative right. The legislature may not, however, impose discriminatory restrictions on the initiative right by making it "not so easy" to get initiatives on the ballot simply for the sake of making it harder to do so and restricting the initiative power. Thus, the multi-county

signature requirement does not pass the uniform operation of laws constitutional hurdle in this respect either because even if we assume that the multi-county signature requirement is reasonably necessary to further, and in fact actually and substantially furthers, the legislative purpose of making it harder to get initiatives on the ballot, that legislative purpose is not legitimate.

¶ 54 To the extent this legislative purpose is essentially aimed at preventing ballot overcrowding, the multi-county signature requirement is not reasonably necessary to further that purpose for the same reasons that it is not a reasonably necessary means to ensure statewide geographic support for initiatives. While the multi-county signature requirement might have the effect of making it more difficult to get initiatives on the ballot, thus reducing the chance of ballot overcrowding, it does so only through invidious discrimination and in a way that overly burdens the initiative right. The other procedural provisions of the initiative enabling statute, specifically, the requirement of numeric statewide support, is sufficient to advance this legislative purpose, rendering the multi-county signature requirement superfluous to furthering the legislative purpose.

¶ 55 Intervenors also contend that the multi-county signature requirement is constitutional because it is reasonably necessary to further, and in fact actually and substantially furthers, the legitimate legislative purpose of promoting initiatives as grassroots legislation. This purported legislative purpose is offered merely as an assertion without any explanation or analysis in defense of its legitimacy. Even if we were to assume this legislative purpose is legitimate, the multi-county signature requirement is not reasonably necessary to further that purpose. The exercise of the legislative power reserved to the people through the initiative process is inherently a "grassroots" endeavor. The very idea and definition of "grassroots" movements or legislation is essentially that the source of the movement or legisla-

tion is at the lowest level of the political and governmental power structure. Because the initiative process is inherently "grassroots" in nature, the legislative purpose of promoting initiatives as grassroots legislation would be satisfied by an initiative statute that enabled the basic initiative right with or without the multi-county signature requirement. This being the case, the multi-county signature requirement is not reasonably necessary to further the stated legislative purpose.

¶ 56 In light of the discriminatory impact and effect of the multi-county signature requirement and its burden on fundamental rights, the disparate treatment resulting from the multi-county signature requirement cannot be considered reasonably necessary to further this legislative purpose because even in the absence of the multi-county signature requirement the legislative purpose would be furthered. In other words, this legislative purpose could still be furthered without infringing constitutionally protected rights through less restrictive, burdensome, or discriminatory means. Therefore, the multi-county signature requirement is unconstitutional with regard to this legislative purpose because it is not reasonably necessary to its furtherance.

¶ 57 Next intervenors argue that the multi-county signature requirement is constitutional because it is reasonably necessary to further, and in fact actually and substantially furthers, the related legitimate legislative purposes of countering the possibility of localized legislation and acting as a check and balance on the majority. Countering the possibility of localized legislation is not a legitimate legislative purpose. The legislature itself does not operate under the requirement that legislation enacted through its processes and procedures must avoid "localized" legislation that potentially favors one region or county of the state.[10] If the avoidance of localized legislation were a legitimate legislative purpose or goal, one would presume that the legislature would tailor its own legislative processes and procedures to ad-

---

10. Any "localized" legislation enacted by the legislature would be subject to the prohibition against special laws of article XI, section 3 of the Utah Constitution, as would any "localized" leg-

islation enacted through the initiative process. *See Grand County v. Emery County*, 2002 UT 57, ¶¶ 7–24, 52 P.3d 1148.

vance that goal or purpose. This, however, is not the case. The legislature is free to pass localized legislation. If the passage of localized legislation is permissible in the context of the enactment of laws via the constitutionally established legislature, it is hard to discern why the deterrence of potential localized legislation should be advanced as a legitimate legislative purpose in the context of the enactment of laws that unduly burden the people's right to initiative via the constitutionally established initiative power.

¶ 58 Moreover, the multi-county signature requirement does not actually and substantially further the legislative purpose of preventing localized legislation because even under the current multi-county signature requirement, nothing would stop an initiative that, for example, imposed a tax on only 2 counties from receiving the required number of signatures in each of 20 or more of 29 counties. Such an initiative could be considered localized legislation, yet the multi-county signature requirement would be ineffective in preventing it.

¶ 59 As to the notion that the multi-county signature requirement is a necessary check "to temper majoritarian rule [and] safeguard minority interests" in the context of the initiative process, the multi-county signature requirement is not reasonably necessary to further that legislative purpose.[11] The lieutenant governor and intervenors claim that the multi-county signature requirement acts as a check and balance on the majority. However, the multi-county signature requirement goes too far in this

11. The system of checks and balances that operates in connection with the three coequal and coextensive branches of our state government are constitutionally mandated and derived. Any checks and balances present in the system are therefore constitutional in nature, not "legislative." The legislature is not free to enact restrictions on constitutionally established and guaranteed rights and powers whenever it perceives that the system of checks and balances is misaligned or out of equilibrium. Such a purpose is not a legitimate legislative purpose. Furthermore, it is not a legitimate legislative purpose to impose checks and balances, i.e., overly burdensome restrictions, on the initiative power when the constitutional responsibility and duty of the legislature in enacting initiative enabling legislation is to facilitate the initiative process.

This legislative purpose is also cast as a means of ensuring that rural populations are involved in the initiative process from its inception and as providing a check and balance within the legislative process itself, similar to the processes and procedures employed during the crafting of legislation in the representative legislature, i.e., the ability to offer amendments, the use of the committee system, or the ability to table a proposed bill. Again, these internal legislative processes and rules of operation are not constitutional checks and balances. The ability of "[e]ach house [to] determine the rules of its proceedings" may be constitutionally established, but the actual rules adopted for the operation of the legislature are not. Utah Const. art. VI, § 12. Nothing in the constitution indicates that it is within the legislature's province to impose on the coequal initiative legislative right a system of checks and balances, that is, rules for operation, akin to the legislature's own internal rules of operation. Allowing such would lose sight of the fact that the representative legislative process, while coequal and coextensive with the direct initiative legislative process, has a different character in our constitutional system than the direct legislative process in that the direct initiative legislative process may be considered a constitutional check on the representative legislature if it fails to enact widely supported legislation, see *Stavros v. Office of Legislative Research & Gen. Counsel*, 2000 UT 63, ¶ 19, 15 P.3d 1013, perhaps because the legislature's internal rules of operation, such as the committee system or tabling, have prevented legislation from being enacted, or where the governor vetoes legislation having popular support but lacking support of two-thirds of the representative legislature to override the governor's veto. *Accord Warren v. Boucher*, 543 P.2d 731, 740 (Alaska 1975) (Erwin and Burke, JJ., dissenting) ("[Initiative and referenda] permit the people to enact laws when the legislature refuses to act, or repeal acts of the legislature which are unpopular or unfair [and are] additional check[s] and balance[s] on the governmental process because [they] act[] upon the legislative awareness that such power exists with the people."); *Mich. United Conservation Clubs v. Sec'y of State*, 464 Mich. 359, 630 N.W.2d 297, 306 (2001) (en banc) (noting that initiative and referendum provisions of Michican Constitution provide "means for citizens directly to challenge Legislative action or inaction"); *Pitman v. Drabelle*, 267 Mo. 78, 183 S.W. 1055, 1057 (1916) (en banc) ("It is the very essence of free government that the laws regulating a community should reflect the view and voice of a majority of its voters [and therefore] the plan (initiative) by which the people are empowered to do the business which their recalcitrant representatives have failed to perform[] has met with full judicial sanction."). Therefore, the direct legislative initiative process was not meant to be subject to the same checks and balances that the representative legislature has chosen to adopt as its internal rules of operation.

regard. By effectively weighting the signatures of the relatively few registered voters residing in rural counties, the multi-county signature requirement affords the rural minority a preemptive veto or check on the majority's power to legislate through the initiative process.

¶ 60 Our system of government is premised on the notion of majority rule with minority rights. Majority rule is the foundational premise of both of the constitutionally mandated mechanisms for enacting legislation. The representative legislature enacts legislation based upon this principle, and the same should be true with respect to the initiative process. In our system of government, in the event the majority abuses or threatens to abuse the rights of the minority, the minority has recourse to the courts to redress the violation of its rights by the majority. Several constitutional provisions serve to protect the minority from the majority, such as the open courts clause, the uniform operation of laws provision, the prohibition against ex post facto laws and special laws. In this regard, the United States Supreme Court has noted that

> to sanction minority control of state legislative bodies [or legislative processes, i.e., initiatives], would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result.... Our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures [or legislative processes, i.e., initiatives].

*Reynolds v. Sims,* 377 U.S. 533, 565–66, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

¶ 61 Regardless of the constitutional mechanism for redress of abuse of the minority by the majority, the vindication of minority rights in almost every circumstance comes after an action taken pursuant to majority rule. The legislature, through the multi-county signature requirement, has put the cart before the horse by giving the minority a preemptive weapon against the perceived potential infringement of the minority's rights from the majority's attempted resort to the initiative process. By doing so, the legislature gives the minority control of the initiative power. This preemptive veto on the initiative power turns our system of majority rule on its head and therefore cannot be considered a reasonably necessary means to further the purpose of maintaining checks and balances in our system of government. Furthermore, the multi-county signature requirement does not actually and substantially further the system of checks and balances in our governmental system because it actually causes the system to fall out of balance by shifting an inordinate and disproportionate amount of power to the rural minority at the expense of the urban majority. Therefore, the purpose of maintaining the system of checks and balances is not furthered but instead hindered.

¶ 62 Finally, the lieutenant governor suggests that the multi-county signature requirement is justified "to insure that there is an informed electorate." We do not doubt the necessity of an informed electorate or that ensuring the existence of one is a legitimate legislative purpose; however, the multi-county signature requirement is not reasonably necessary to further, nor does it actually and substantially further, that legislative purpose. The multi-county signature requirement does not promote an informed electorate. At most, the requirement that initiative proponents circulate petitions and gain signatures in 20 (or more) of Utah's 29 counties merely exposes a number of registered voters in those counties to the basic issue underlying the proposed initiative. The circulation of the petition is only the initial stage of the election process, however. In reality, it is after the initiative is placed on the election ballot and the campaigns for and against the initiative are underway that the electorate becomes informed. Therefore, in some respects, the multi-county signature requirement hinders the development of an informed electorate as to the subjects of initiatives because the multi-county signature requirement unduly hinders the ability to get initiatives on the ballot, thus preventing the waging of a full-scale campaign on the issue.

¶ 63 Nor is the multi-county signature requirement reasonably necessary to further the legislative purpose of enabling an in-

formed electorate. Because the electorate becomes informed through the campaigns for and against the proposed initiative after an initiative is placed on the ballot regardless of whether the proponents of an initiative circulated the initial petition in and garnered signatures from the required counties, the requirement is not reasonably necessary to further the stated legislative purpose.

¶ 64 The multi-county signature requirement effectively discriminates against urban voters in that it affords the registered voters of rural counties a disproportionate amount of voting power. The multi-county signature requirement's discriminatory classification is unconstitutional under the uniform operation of laws provision of the Utah Constitution because it is not reasonably necessary to further, and does not in fact actually and substantially further, any of the proffered legislative purposes. We therefore hold that the requirement constitutes a violation of the Utah Constitution and note that the result in this case is explicitly premised on that holding. Although we address the federal claims raised by the parties, our state constitutional analysis constitutes an independent ground for our decision. *Cf. Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

### B. Federal Equal Protection

¶ 65 Gallivan also challenges the multi-county signature requirement provision on the ground that it contravenes the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, arguing that the requirement imposes severe and discriminatory restrictions on the initiative right because it effectively increases the relative weight of the signatures of registered voters in the rural, sparsely populated counties while concurrently diluting the relative weight of the signatures of voters in the urban, more populous counties, thus discriminating against urban voters by allowing rural voters to act as gatekeepers who can prevent initiatives from qualifying for placement on the ballot. Gallivan asserts that because the multi-county signature requirement severely burdens the rights of urban voters, the re-

quirement "must be analyzed with the strictest scrutiny."

¶ 66 The lieutenant governor and intervenors contend that the multi-county signature requirement does not severely burden the rights of urban voters and is therefore to be analyzed only under rational basis scrutiny. Nevertheless, they contend that the multi-county signature requirement passes constitutional muster under either rational basis or strict scrutiny.

¶ 67 The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, "which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *see also State v. Lafferty,* 2001 UT 19, ¶ 70, 20 P.3d 342.

¶ 68 Accordingly, the Equal Protection Clause requires states generally to treat voters similarly and not to unreasonably subject voters to disparate treatment. The United States Supreme Court recently stated:

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.

*Bush v. Gore,* 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

¶ 69 Petitioning to place an initiative on the ballot is an integral part of Utah's initiative procedures and processes and is inextricably intertwined with the voters' right to vote on initiatives, serving a gatekeeping function to that right to vote. *See Moore v. Ogilvie,* 394 U.S. 814, 818, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). Because petitioning to place an initiative on the ballot is "an integral part of the election process," the procedure "must pass muster against the charges of discrimination or of abridgment of the right to vote" under the Equal Protection Clause. *Id.* According-

ly, we must determine whether the multi-county signature requirement violates the Equal Protection Clause of the Fourteenth Amendment.

1. Multi–County Signature Requirement under *Moore v. Ogilvie*

¶ 70 For decades the United States Supreme Court has held unconstitutional state election laws when there is a disparity in the political and voting power of the voters similarly situated within a state. In 1962, the Court reversed a federal district court that had determined that it lacked subject matter jurisdiction and remanded, ordering that the district court conduct a trial regarding the asserted constitutional claim that the state apportionment act was "offensive to the Fourteenth Amendment" in that it effected "a gross disproportion of representation to voting population" because the act's "classification disfavors the voters in counties in which [the appellants] reside, placing them in a position of constitutionally unjustifiable inequality *vis-a-vis* voters in irrationally favored counties." *Baker v. Carr,* 369 U.S. 186, 207–08, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

¶ 71 Then in 1963, the United States Supreme Court declared unconstitutional Georgia's county-unit system under the Equal Protection Clause of the Fourteenth Amendment. *Gray v. Sanders,* 372 U.S. 368, 379–81, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). In *Gray,* Georgia's county-unit system gave "every qualified voter one vote in a statewide election; but in counting those votes [Georgia] employ[ed] the county unit system which in end result weight[ed] the rural vote more heavily than the urban vote and weight[ed] some small rural counties heavier than other larger rural counties." *Id.* at 379, 83 S.Ct. 801. Declaring this county-unit system unconstitutional, the Court, adopting the one person, one vote principle, explained:

> The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—*one person, one vote.*

*Id.* at 381, 83 S.Ct. 801 (emphasis added). Striking down the Georgia county-unit system, the Court reasoned:

> *How then can one person be given twice or ten times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county?* Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and *wherever their home may be in that geographical unit.* This is required by the Equal Protection Clause of the Fourteenth Amendment.

*Id.* at 379, 83 S.Ct. 801 (emphasis added).

¶ 72 The next year, the United States Supreme Court held unconstitutional Alabama's legislative apportionment system, stating:

> Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status.

*Reynolds v. Sims,* 377 U.S. 533, 565–66, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (citing *Brown v. Bd. of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963)). In *Reynolds,* the Court reasoned, "Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable." 377 U.S. at 563, 84 S.Ct. 1362.

¶ 73 While the foregoing cases address votes rather than a voter's right to petition to place a candidate or direct legislation on the ballot, in 1969 the Court applied the "one person, one vote" principle to the petition context in *Moore v. Ogilvie.* 394 U.S. at

818–19, 89 S.Ct. 1493. At issue in *Moore* was "[t]he use of nominating petitions by independents to obtain a place on the Illinois ballot." 394 U.S. at 818, 89 S.Ct. 1493. The Court explained that the "one person, one vote" principle applied to nomination petitions because the use of such petitions

> is an integral part of [Illinois's] election system. All procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgement of the right to vote.

*Id.* (citation omitted).

¶ 74 In *Moore*, the Court held that an Illinois statute requiring 200 signatures from qualified voters in at least 50 of the state's 102 counties was unconstitutional under the Equal Protection Clause according to the one person, one vote principle. *Id.* at 818–19, 89 S.Ct. 1493. The statute at issue in *Moore* required at least 25,000 voters statewide to sign a nomination petition and 200 qualified voters to sign nomination petitions in each of at least 50 of the state's 102 counties before a candidate could be placed on the ballot. *Id.* at 815, 89 S.Ct. 1493. At the time the case was pending before the Court, 93.4 percent of the state's total population was concentrated in the 49 most populous counties and only 6.6 percent of the population resided in the remaining 53 counties. *Id.* at 816, 89 S.Ct. 1493. The Court held the Illinois requirement of obtaining 200 signatures in 50 counties unconstitutional, stating:

> The law ... discriminates against the residents of the populous counties of the State in favor of rural sections. It, therefore, lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment.

*Id.* at 819, 89 S.Ct. 1493. The Court explained:

> Under this Illinois law the electorate in 49 of the counties which contain 93.4% of the registered voters may not form a new political party and place its candidates on the ballot. Yet 25,000 of the remaining 6.6%

of registered voters properly distributed among the 53 remaining counties may form a new party to elect candidates to office. *Id.*[12]

¶ 75 Several courts have applied *Moore* to invalidate election laws that discriminate between voters of populous and sparsely settled counties. *See, e.g., Blomquist v. Thomson*, 739 F.2d 525, 528 (10th Cir.1984) (holding Wyoming two-county rule unconstitutional under *Moore*); *Communist Party v. State Bd. of Elections*, 518 F.2d 517, 521 (7th Cir. 1975) (holding Illinois two-county rule unconstitutional under *Moore*); *Baird v. Davoren*, 346 F.Supp. 515, 522 (D.Mass.1972) (holding election law violates equal protection because it "has the effect of discriminating between voters in populous and sparsely-settled counties"); *Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984, 990 (S.D.N.Y.1970) (invalidating law that granted voters in rural, less populous counties "an absolute equal veto power over the nomination of any candidate"); *Socialist Workers Party v. Hare*, 304 F.Supp. 534, 536 (E.D.Mich.1969) (holding that election law that is "discriminatory against voters in populous counties" violates equal protection).

¶ 76 Then, in 2001, the United States District Court for the District of Idaho held unconstitutional an Idaho requirement that initiative sponsors obtain "signatures [from] at least 6 percent of qualified electors from each of" 22 of Idaho's 44 counties before an initiative qualifies to be placed on the Idaho general election ballot. *Idaho Coalition United for Bears v. Cenarrusa*, Civ. No. 00–0668–S–BLW, slip op. at 9–10 (D.Idaho Nov. 30, 2001). The Idaho District Court concluded that *Moore* governed that case and stated, "Idaho's law suffers from the same flaw as the Illinois law struck down in *Moore*." *Id.* at 10. The court explained:

> Because over 60% of Idaho's population resides in just 9 of the State's 44 counties, it is easy to envision a situation where 3/4 of Idaho's voters sign a petition but fail to

---

12. More recently, in *Bush,* the United States Supreme Court reiterated the rule that states cannot treat voters differently under the Equal Protection Clause simply because they reside in different counties. 531 U.S. at 106–07, 121 S.Ct. 525 (citing *Moore,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1).

get it on the ballot because they could not collect 6% of the vote in the rural counties. *Id.*

¶ 77 Intervenors argue that *Moore* is distinguishable from this case because *Moore* "involved requirements for placing third-party candidates on the ballot," while "this case involves rules regarding direct legislation." However, intervenors have not provided us a cogent reason why a different rule should apply to candidates on the one hand and to initiatives on the other. The only difference between the case of a petition to place a candidate on the ballot and the case of a petition to place an initiative on the ballot is that the first involves a person and the second involves an idea that possibly could become law. The voters' suffrage right is fundamental and not to be infringed, regardless of whether the voters are voting for candidates or initiatives. Additionally, in either case, a multi-county requirement like the requirement at issue in this case would mitigate or eliminate the voters' right to vote because neither the candidate nor the initiative would ever be placed on the ballot. Accordingly, in the context of whether there is an equal protection violation regarding ballot access, the distinction between whether ballot access is denied to a candidate rather than to an initiative is a distinction without a relevant difference, and therefore a different rule is not required in this case. *See Idaho Coalition United for Bears,* Civ. No. 00–0668–S–BLW, slip op. at 10. Therefore, we apply *Moore.*

¶ 78 The multi-county signature requirement in this case unconstitutionally suffers from the same infirmities as the Illinois law in *Moore* and the less severe [13] multi-county signature requirement of the Idaho statute struck down in *Idaho Coalition United for Bears.* As in both *Moore* and *Idaho Coalition United for Bears,* the multi-county signature requirement in this case invidiously discriminates against voters in urban areas. The multi-county signature requirement requires sponsors to obtain

from each of at least 20 counties, legal signatures equal to 10% of the total of all votes cast in that county for all candidates for governor at the last regular general election at which a governor was elected. Utah Code Ann. § 20A–7–201(2)(a)(ii) (Supp. 2001). Requiring signatures from at least 20 counties is intrinsically discriminatory against voters in urban counties because it impermissibly exalts the power of voters in rural, sparsely populated counties: The multi-county signature requirement effectively increases the relative weight of the signatures of voters in the rural counties and diminishes the relative weight of signatures of urban voters, permitting rural voters to foreclose the placement of an initiative on the ballot, even if the majority of the voters in the state desire the initiative to be on the ballot. In Utah, three-fourths of the state's population resides in only 4 Wasatch Front counties: Weber, Davis, Salt Lake, and Utah. Further, 87.14 percent of the state's overall population is concentrated in the 14 counties in which the sponsors satisfied the individual county signature requirement of the multi-county signature requirement. Comparatively, the aggregate population of the remaining 15 counties is *less* than 13 percent of the state's total population. To place a proposed initiative on the ballot, sponsors would be required to meet the signature requirement in at least 6 of the 15 counties in which less than 13 percent of the statewide population resides and in 16 of the 24 counties in which only a quarter of the state's population resides. Such a requirement concentrates an inordinate and disproportionate amount of control over qualifying initiatives for placement on the ballot to voters in those less populous counties, effectively affording a few voters a preemptive veto over placement of a proposed initiative on the ballot based solely upon the county in which those voters reside.

¶ 79 This problem is exacerbated by the removal provision of Utah Code section 20A–7–205(3)(a), which allows voters to remove their signatures from initiative petitions after

---

**13.** The Idaho law requires sponsors of an initiative petition to meet Idaho's multi-county signature requirement in 22 of 44 counties, or in half of Idaho's counties. By way of comparison, the Utah multi-county signature requirement provides that sponsors of an initiative petition must meet Utah's signature requirement in 20 of 29 counties, or more than two-thirds of the counties.

the petitions have been submitted to the county clerks for certification and after the sponsors can no longer solicit additional signatures to replace removed signatures. The removal provision effectively allows an initiative petition to be defeated by the removal of a very small number of voters' signatures from initiative petitions in specifically targeted rural counties. Indeed, in this case opponents of the initiative conducted a concerted campaign in rural counties to encourage voters in those counties to remove their signatures from initiative petitions after the petitions had been delivered to the county clerks, and around 3,000 voters in rural counties removed their signatures, effectively preventing the initiative from qualifying for placement on the ballot.

¶ 80 As in *Moore* and *Idaho Coalition United for Bears,* the disparity in power between the registered voters in rural counties and the registered voters in urban counties under the multi-county signature requirement is constitutionally impermissible, and such invidious discrimination will not be constitutionally tolerated. Thus, the multi-county signature requirement is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

2. Multi–County Signature Requirement under *Burdick v. Takushi*

¶ 81 It is argued that the United States Supreme Court case of *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), supplies the rule as to when strict scrutiny applies in election cases.[14] The Supreme Court explained in *Burdick:*

A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the

rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

504 U.S. at 434, 112 S.Ct. 2059 (quotations omitted). "Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* Accordingly, "when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " *Id.* (quoting *Norman v. Reed,* 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). If the challenged election law provision "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).

¶ 82 Because *Moore v. Ogilvie* controls the outcome of this case regardless of the level of scrutiny applied, we apply *Moore* and its related United States Supreme Court precedent to this case and find it dispositive. *See supra* part I.B.1. Nevertheless, under *Burdick* strict scrutiny applies. In this case, there are severe restrictions on the rights of registered voters in Utah's most populous counties, compelling us to use strict scrutiny analysis. The United States Supreme Court explained:

Restrictions on access to the ballot burden two distinct and fundamental rights, "the

---

**14.** Intervenors contend that *Burdick* is inapposite because it is a case involving ballot access for candidates rather than ballot access for initiatives. Specifically, intervenors contend, citing the Western District of Arkansas case of *Hoyle v. Priest,* 59 F.Supp.2d 827 (W.D.Ark.1999), and the Massachusetts Supreme Court case of *Massachusetts Public Interest Research Group v. Secretary of Commonwealth,* 375 Mass. 85, 375 N.E.2d 1175, 1182 (1978), that voting for a candidate is a fundamental constitutional right, while the right to have an initiative on the ballot is not.

However, as stated above, the right of initiative is a fundamental right under the Utah Constitution, and as applied in this case, the multi-county signature requirement serves a gatekeeping function that can, in certain cases, burden the fundamental right to vote by precluding the placement on the ballot of initiatives supported by a majority of the people of the state. In any event, as explained in the previous section, there is no relevant distinction between candidate nominating petitions and initiative petitions. *See supra* ¶ 77.

right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." ...

When such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest.

*Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (quoting *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)). The multi-county signature requirement discriminates against urban voters because it allows voters in rural counties to wield disproportionate power over the placement of initiatives on the ballot. *See supra* ¶¶ 45, 78–79. Thus, the multi-county signature requirement does not impose a " 'reasonable, nondiscriminatory restriction[ ]' upon the ... rights of voters" in the more populous counties of the state. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564).

¶ 83 Accordingly, under *Burdick,* the multi-county signature requirement "must be narrowly drawn to advance a state interest of compelling importance." 504 U.S. at 434, 112 S.Ct. 2059; *see also Illinois State Bd. of Elections,* 440 U.S. at 185, 99 S.Ct. 983 (noting that "where restrictions on access to the ballot are involved," " 'a State may not choose means that unnecessarily restrict constitutionally protected liberty,' [and must] adopt the least drastic means to achieve their ends" (quoting *Kusper v. Pontikes,* 414 U.S. 51, 58–59, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973))). The justifications advanced in support of the multi-county signature requirement, set forth in paragraph 47 of this opinion, are not "narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059. First, the proffered justifications fail to meet our own heightened-scrutiny analysis under the uniform operation of laws provision of the Utah Constitution, *see supra* ¶¶ 47–63, which "is at least as exacting" if not more so than the Equal Protection Clause of the Fourteenth Amendment. *Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884, 889

(Utah 1988). Second, the proffered justification that the multi-county signature requirement exists to ensure statewide support for initiatives fails under *Moore. Moore* itself rejected this as a justification for a law that discriminates against the political rights of registered voters in violation of the Equal Protection Clause. *Moore,* 394 U.S. at 818–19, 89 S.Ct. 1493. The Court explained in *Moore:*

> It is no answer to the argument under the Equal Protection Clause that this law was designed to require statewide support for launching a new political party rather than support from a few localities. This law applies a rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional theme of equality among citizens in the exercise of their political rights. The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.

*Id.* Therefore, although *Moore* governs this case, the multi-county signature requirement does not pass constitutional muster under the strict scrutiny test of *Burdick.*

## II. FREE SPEECH

■ ¶ 84 Gallivan also contends that the multi-county signature requirement is unconstitutional because it violates the free speech guarantees of the First Amendment to the United States Constitution and article I, section 15 of the Utah Constitution. Because we decide this case based upon the fundamental rights arguments associated with the uniform operation of laws provision, and the Equal Protection Clause, we do not need to address these additional constitutional challenges. *See State v. Telford,* 2002 UT 51, ¶ 8, 48 P.3d 228; *Salt Lake City Corp. v. Prop. Tax Div. of State Tax Comm'n,* 1999 UT 41, ¶ 30, 979 P.2d 346; *State v. Lopes,* 1999 UT 24, n. 4, 980 P.2d 191; *Valley Colour, Inc. v. Beuchert Builders, Inc.,* 944 P.2d 361, 363 n. 1 (Utah 1997).

## III. SEVERABILITY

■ ¶ 85 Having concluded that section 20A–7–201(2)(a)(ii) of the Utah Code is un-

constitutional, we must determine if that subsection is severable from the rest of the initiative enabling statute.

¶ 86 The lieutenant governor, intervenors, and legislature argue that the multi-county signature requirement is not severable from the remainder of the statute and that therefore this court's only option in light of its holding that section 20A–7–201(2)(a)(ii) is unconstitutional is to invalidate and strike down the entire initiative enabling statute. Gallivan counters that the subsection setting forth the multi-county signature requirement is not an integral part of the statute and that it can be severed from the overall statutory scheme, leaving the rest of the initiative enabling statute operable and effective.

¶ 87 When reviewing the construction of statutes, "[t]he general rule is 'that statutes, where possible, are to be construed so as to sustain their constitutionality. Accordingly, if a portion of the statute might be saved by severing the part that is unconstitutional, such should be done.' " *State v. Lopes,* 1999 UT 24, ¶ 18, 980 P.2d 191 (quoting *Celebrity Club, Inc. v. Utah Liquor Control Comm'n,* 657 P.2d 1293, 1299 (Utah 1982)).

¶ 88 In determining if an unconstitutional subsection is severable from its umbrella statute, "we look to legislative intent." *Id.* at ¶ 19. When the legislature's intent is not expressly stated, we "turn to the statute itself, and examine the remaining constitutional portion of the statute in relation to the stricken portion." *Id.* Upon reviewing the statute as a whole and its operation absent the offending subsection, "[i]f the remainder of the statute is operable and still furthers the intended legislative purpose, the statute will be allowed to stand." *Id.; see also Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 686 (Utah 1985) ("Severability, where part of an act is unconstitutional, is primarily a matter of legislative intent[,] which generally is determined by whether the remaining portions of the act can stand alone and serve a legitimate legislative purpose." (citations omitted, alteration in original)); *Stewart v. Pub. Serv. Comm'n,* 885 P.2d 759, 779–80 (Utah 1994); *Union Trust Co. v. Simmons,* 116 Utah 422, 429, 211 P.2d 190, 193 (1949). In *Union Trust Co.,* we further noted that

"[t]he test fundamentally is whether the Legislature would have passed the statute without the objectionable[, i.e., the unconstitutional] part ...." 116 Utah at 429, 211 P.2d at 193; *see also Berry,* 717 P.2d at 686.

¶ 89 The legislature did not include in the initiative enabling statute an express indication of its legislative intent regarding the severability of potentially unconstitutional portions of the statute. Therefore, we must determine whether the initiative enabling statute is operable without the multi-county signature requirement and whether the initiative enabling statute furthers a legitimate legislative purpose without that provision.

¶ 90 The initiative enabling statute is still operable after the offending subsection is removed. Even without the multi-county signature requirement, the initiative enabling statute establishes a workable process and framework through which the citizens of Utah can exercise their constitutionally guaranteed right to directly legislate via the fundamental initiative power. The procedure for placing an initiative on the ballot would function at least as well as the system currently in place. Simply excising the multi-county signature requirement from the initiative enabling statute does nothing to affect the statute's operability.

¶ 91 The statute still furthers the intended and legitimate purpose of enabling the people's initiative right. As we have indicated previously, subsection 2 of article VI, section 1 requires the legislature to enact legislation to enable the people to exercise their reserved power and right to directly legislate through initiative. *See supra* ¶¶ 28–29. The clear purpose of the initiative enabling statute, therefore, must be to establish a framework through which the citizens of Utah can effectuate their reserved article VI, section 1 power. Indeed, the initiative enabling statute itself invokes the Utah Constitution and states that "[b]y following the procedures and requirements of [the initiative enabling statute], Utah voters may, subject to the restrictions of Article VI, Sec. 1, Utah Constitution and this chapter[,] ... initiate any desired legislation and cause it to be submitted ... to a vote of the people." Utah Code

Ann. § 20A–7–102 (1998). Moreover, this court has stated that the "purpose" of the initiative enabling statute is "that the people be permitted to vote and express their will on proposed legislation." *Cope v. Toronto,* 8 Utah 2d 255, 259, 332 P.2d 977, 979 (1958) (per curiam).

¶ 92 The overriding and controlling purpose of the initiative enabling statute is still furthered without the multi-county signature requirement. Because the purpose of the statute is to enable the citizens of Utah to legislate through the initiative process and the removal of the multi-county signature requirement would not impact the effectuation of the initiative right, the purpose of the statute is still furthered. In fact, the removal of the multi-county signature requirement at a minimum eliminates an overly burdensome discriminatory hurdle to the exercise of the right and in doing so effectively makes it easier for the citizens of Utah to exercise their constitutionally guaranteed legislative power through initiative. In other words, the purpose of the initiative enabling statute is perhaps better furthered through the excise of the multi-county signature requirement.

¶ 93 Finally, as to the question of whether the legislature would have enacted the initiative enabling statute without the constitutionally infirm multi-county signature requirement, we note that the constitutional mandate in article VI, section 1 dictates that the legislature must enact legislation to enable the exercise of the initiative power. Because the legislature would be required to enact initiative enabling legislation in any event, under the constitutional requirement, the legislature would have to enact the rest of the initiative enabling statute without the unconstitutional provision. In other words, the legislature would have enacted the initiative enabling statute without the multi-county signature requirement because it is compelled to do so by subsection 2 of article VI, section 1 in order to enable the citizens to exercise their reserved initiative power. The legislature cannot claim that they would not have enacted the initiative enabling statute without the multi-county signature requirement because in making such a claim the legislature would be admitting that it would have chosen to shirk its constitutional duty to establish a framework for the exercise of the people's constitutionally guaranteed initiative right. We are certain the legislature, had it known of the unconstitutionality of the multi-county signature requirement, would have met its constitutional responsibility by enacting the initiative enabling statute without the unconstitutional subsection.

¶ 94 Therefore, the multi-county signature requirement set forth in section 20A–7–201(2)(a)(ii) is severable because the remainder of the initiative enabling statute will continue to be operable and continue to serve a legitimate legislative purpose after the unconstitutional multi-county signature requirement provision is excised.

## CONCLUSION

¶ 95 For the foregoing reasons, the multi-county signature requirement is unconstitutional first, and independent, because it violates the uniform operation of laws provision of the Utah Constitution, and also because it violates the Equal Protection Clause of the United States Constitution. Additionally, the unconstitutional multi-county signature requirement of Utah Code section 20A–7–201(2)(a)(ii) is severable from the statewide initiative enabling statute. Accordingly, Gallivan's petition for an extraordinary writ is granted, and the lieutenant governor is ordered to place the initiative on the 2002 general election ballot.[15]

¶ 96 Justice HOWE concurs in Justice RUSSON's opinion.

DURHAM, Chief Justice, concurring:

¶ 97 I concur with Justice Russon's opinion, with the exception of Part B ("Federal Equal Protection"). Having concluded that

---

15. The statutory deadlines established in the initiative enabling statute have been rendered inoperable in this case by the instant litigation. The operable time frame in this case is November 5, 2002, the date of the general election. There-fore, all that is required in this case is for the lieutenant governor to ensure that the initiative is on the ballot by that date. The deadlines established in the initiative enabling statute otherwise remain effective for future proposed initiatives.

the multi-county signature requirement violates the Utah constitution, the court ought not, in my view, offer what is in effect an advisory opinion on the federal question. When this court has determined that state constitutional law does not permit the challenged legislative action, the case is fully resolved, and the federal claim becomes moot. This seems to me to be a fundamental characteristic of federalism, and consistent with the perspective that courts should generally resolve cases on the narrowest applicable grounds unless specific reasons exist for offering broader guidance. I agree that the federal question is an important one, and perhaps the United States Supreme Court would appreciate this court's analytic contribution when and if the question reaches that court (in *Idaho Coalition United for Bears*, for example), but I think that this is fundamentally a state law case, given the unique role that initiative lawmaking has in the state system, and the absence of any federal constitutional counterpart.

THORNE, Judge, dissenting.

¶ 98 I respectfully dissent from both the conclusion that section 20A–7–201(2)(a)(ii) creates an unconstitutional abridgement of the Utah Constitution and from the analysis that equates the initiative right with the right to vote, thereby establishing the "initiative right" as one of the relatively few fundamental rights.

¶ 99 First, Petitioners have presented this court with a facial challenge to the use of any non-population based geographic distribution requirement in the initiative process. To succeed, Petitioners must demonstrate that no circumstances exist under which such requirement can be found constitutional. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); *State v. Herrera*, 1999 UT 64, ¶ 4 n. 2, 993 P.2d 854. Instead of performing a facial analysis of the question presented, the majority seemingly addresses the statute as applied.

¶ 100 Second, I believe the majority's decision to equate the people's initiative ability with the fundamental right to vote to be a new development, untested and unsupportable. I believe the majority's analysis of the nature of the initiative process is inadequate and the majority merely concludes that the people's ability to seek changes to the law through the initiative process is the same as voting rights because the initiative process, at its conclusion, involves the right to vote.[1]

¶ 101 While I agree that the right to initiative is granted within the State Constitution, I do not agree that this right is unfettered. The plain language of Article VI, § 1 establishes in the people the ability to legislate through the initiative process as reasonably defined and controlled by the legislature. While it is the responsibility of this court to ensure that the legislature does not unreasonably restrict this ability, I would conclude that the geographic distribution requirement is not unreasonable; therefore it does not infringe upon the people's ability to legislate.

¶ 102 Rather than the approach adopted by the majority, I would address Petitioners' arguments with the following analysis:

## I. FEDERAL ANALYSIS

¶ 103 Petitioners first argue that Utah Code Ann. § 20A–7–201(2)(a)(ii) (Supp.2001), requiring Petitioners to demonstrate broad-based geographic support[2] before an initiative can be placed on the ballot, violates

1. I also believe that the majority position may have been more persuasive had the majority equated the initiative right with the right to associate as a political party. The reasons underlying a person's decision to join or create a new political party may, in some cases, be identical to their reasons for utilizing the initiative process, and therefore, may be subject to similar protections. *See Illinois State Bd. of Elections v. Socialist Workers*, 440 U.S. 173, 187, 99 S.Ct. 983, 991–92, 59 L.Ed.2d 230 (1979) (stating "[t]he freedom of association as a political party, a right we have recognized as fundamental, has diminished practical value if the party can be kept off the ballot" (citation omitted)). The majority, however, does not attempt an analysis of this approach.

2. Pursuant to the plain language of section 20A–7–201(2)(a)(ii), Petitioners were required to obtain signatures from a specified number of counties. Throughout this dissent I refer to this requirement either as the "geographic distribution requirement" or as section 20A–7–201(2)(a)(ii).

federal principles of equal protection and freedom of speech.

¶ 104 The ability to pursue a change in the law through the initiative process is solely a state-created right. *See Meyer v. Grant*, 486 U.S. 414, 424, 108 S.Ct. 1886, 1893, 100 L.Ed.2d 425 (1988); *Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1211 (10th Cir.2002); *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir.1997); *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir.1996); *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 294 (6th Cir.1993); *Bowers v. Polk County Bd. of Supervisors*, 638 N.W.2d 682, 692 (Iowa 2002). Absent a state provision creating this right, an initiative right does not exist and no violation of the U.S. Constitution is possible. *See Todd*, 279 F.3d at 1211; *Bates v. Jones*, 131 F.3d 843, 854 (9th Cir.1997) (O'Scannlain, J., concurring); *Austin*, 994 F.2d at 295; *Massachusetts Pub. Interest Research Group v. Secretary of Commonwealth*, 375 Mass. 85, 375 N.E.2d 1175, 1182 (1978). However, once a state creates an initiative process, the system must comport with the protections afforded under the U.S. Constitution. *See Austin*, 994 F.2d at 295; *Hoyle v. Priest*, 59 F.Supp.2d 827, 836 (W.D.Ark.1999). Included in these protections are the right to equal protection under the law and the right to freedom of speech. *See id.*

### A. Free Speech

¶ 105 The First Amendment of the United States Constitution provides that Congress "shall make no law ... abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." *Meyer*, 486 U.S. at 420, 108 S.Ct. at 1891 (1988); *see also* U.S. Const. amend. I. " '[T]he freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State.' " *Meyer*, 486 U.S. at 420, 108 S.Ct. at 1891 (quoting *Thornhill v. Alabama*, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)).

¶ 106 "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Id.* at 421, 108 S.Ct. at 1892 (quoting *Thornhill*, 310 U.S. at 101–02, 60 S.Ct. 736). The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). Petitioners seek to utilize the initiative process to achieve political change in Utah by exercising their right to engage freely in discussions concerning the need for that change as guaranteed by the First Amendment. *See id.*

¶ 107 In *Meyer*, the Supreme Court reviewed a Colorado statute that prohibited the use of paid personnel to assist in the circulation of an initiative petition. *See id.* at 416, 108 S.Ct. 1886. The Court struck down this prohibition as violative of both the First and the Fourteenth Amendments. *See id.* at 428, 108 S.Ct. 1886. The Court noted that:

[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Id.* at 421–22, 108 S.Ct. at 1891–92. Recognizing that persuading citizens to sign an initiative necessarily involves political speech, and that there is value in allowing the citi-

zenry to freely seek political change through the initiative process, the Court viewed Colorado's limitation on the qualification of petition circulators as an unreasonable restraint on free speech. *See id.* at 428, 108 S.Ct. 1886. Thus, any state statute that unreasonably prohibits core political speech—citizens openly debating political issues during an initiative process—must be closely scrutinized.

¶ 108 In the case before the court today, Petitioners claim that their federally-protected right to free speech has been violated. Petitioners present a twofold argument: First, they claim that their free speech rights have been infringed because they were unsuccessful in getting their initiative on the ballot. They next argue that section 20A–7–201(2)(a)(ii) infringes upon core political speech. I address each in turn.

¶ 109 Petitioners first argue that their free speech right has been infringed because they were unsuccessful in placing their initiative on the ballot due to their failure to satisfy a geographic distribution requirement. Free speech, however, guarantees neither success in placing an item on the ballot nor eventual ratification by voters. Rather, free speech is found in the interplay of ideas during the attempt to capture the voters' curiosity and support. In *Skrzypczak v. Kauger*, 92 F.3d 1050 (10th Cir.1996), an Oklahoma woman sought to place an initiative on the general ballot but was refused on the grounds that the initiative was unconstitutional. *See id.* at 1052. The woman brought suit claiming the requirement that initiatives be subject to a screening before placement on the ballot constituted a prior restraint on her free speech. *See id.* The Tenth Circuit dismissed her claim concluding that the woman did not have a constitutional right to have her initiative placed on the ballot. *See id.* at 1053. The court stated:

> Skrzypczak mistakenly conflates her legally-protected interest in free speech with her personal desire to have [an initiative] on the ballot. In removing [the initiative] from the ballot, the Oklahoma Supreme Court has not prevented Skrzypczak from speaking on any subject. She is free to argue against legalized abortion, to con-

tend that pre-submission content review of initiative petitions is unconstitutional, or to speak publicly on any other issue. Her right to free speech in no way depends on the presence of [the initiative] on the ballot. Moreover, she cites no law, and we find none, establishing a right to have a particular proposition on the ballot.

*Id.* at 1053; *see also Washington v. Finlay*, 664 F.2d 913, 927–28 (4th Cir.1981) (noting that free speech does not equate to an entitlement to success in one's attempt to get a political viewpoint on the ballot).

¶ 110 Petitioners mistakenly rely upon language in *Meyer*, where the Court noted that a statute may burden political speech by making it "less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 423, 108 S.Ct. at 1892. Petitioners take this quote out of context and thereby subvert its meaning. Fully viewed, the Court in *Meyer* stated:

> The refusal to permit appellees to pay petition circulators restricts political expression in two ways: First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

*Id.* at 422–23, 108 S.Ct. at 1892.

¶ 111 The Court explained that restricting the use of paid circulators violated free speech because the "prohibition against the use of paid circulators has the inevitable effect of reducing the total quantum of speech on a public issue." *Id.* at 423, 108 S.Ct. at 1892. A more correct reading of *Meyer* is not that free speech was infringed in that case simply because the law made it less likely that citizens would garner enough signatures, but the violation occurred because the *manner* by which the signatures were to be garnered (which necessarily included core political speech) was unreason-

ably restricted. Thus, a regulation that makes it more difficult to gather signatures in support of an initiative, in and of itself, does not necessarily infringe free speech. *See Todd,* 279 F.3d at 1211 (noting "the right to free speech ... [is] not implicated by the state's creation of an initiative procedure, but only by the state's attempts to *regulate speech* associated with an initiative procedure. (emphasis added)); *Biddulph,* 89 F.3d at 1498 n. 7 (recognizing that the Supreme Court in *Meyer* set forth "a distinction between a state's power to regulate the initiative process in general and the power to regulate the exchange of ideas.").

¶ 112 On its face, section 20A–7–201(2)(a)(ii) does not limit or restrict Petitioners' opportunity to engage in political speech, disseminate their ideas, or solicit support.[3] Rather, Petitioners are required to meet both a popular support threshold and a geographic distribution support threshold before their ideas are submitted to the citizens for a vote. Accordingly, section 20A–7–201(2)(a)(ii) requires Petitioners to disseminate their political message to a large number of people across a broad geographic area in seeking to place an initiative on the ballot. In contrast to the situation in *Meyer,* where the regulation prevented citizens from utilizing the "most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication," *Meyer,* 486 U.S. at 424, 108 S.Ct. at 1893, section 20A–7–201(a)(ii) encourages Petitioners to spread their political message via one-on-one communication with people across a wide geographic area. In this regard, the statute actually encourages free speech rather than unconstitutionally restricting it.

¶ 113 In *Dobrovolny,* appellants challenged a state constitutional provision that required an initiative petition to have secured the signatures of ten percent (10%) of the registered voters in Nebraska by the date the initiative was submitted. *See* 126 F.3d at 1112. The appellants claimed the constitutional provision violated their free speech and

due process rights under the United States Constitution because they had insufficient prior notice of the number of signatures required. *See id.* In finding that the state constitutional provision did not violate any federally protected rights, the Eighth Circuit stated:

> [T]he constitutional provision at issue here does not in any way impact the communication of appellants' political message or otherwise restrict the circulation of their initiative petitions or their ability to communicate with voters about their proposals. Nor does the provision regulate the content of appellants' political speech. While the Nebraska provision may have made it difficult for appellants to plan their initiative campaign and efficiently allocate their resources, *the difficulty of the process alone is insufficient to implicate the First Amendment,* as long as the communication of ideas associated with the circulation of petitions is not affected.

*Id.* at 1112–13 (emphasis added).

¶ 114 Accordingly, Petitioners' free speech rights to conduct political discussion during the solicitation of signatures and, later, during the attempt to persuade voters, is not infringed by section 20A–7–201(2)(a)(ii). *See Hoyle,* 59 F.Supp.2d at 836 (finding that a law requiring petition signers to be fully registered voters did not involve a restriction on core political speech).

¶ 115 Section 20A–7–201(2)(a)(ii) establishes the conditions that must be met for an initiative to be placed on the ballot. Creating such requirements is within the province of the state. *See Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (noting that "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections"). Establishing such requirements prevents frivolous initiatives from being placed on the ballot and ensures that state funds and efforts are utilized only on those initiatives that have

---

**3.** Freedom of speech has been defined as implicating several areas. *See, e.g., Riley v. Nat'l Fed'n. of Blind of N.C.,* 487 U.S. 781, 789, 108 S.Ct. 2667, 2673, 101 L.Ed.2d 669 (1988) (acknowledging solicitation of charitable contribution is

protected speech); *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 97–98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972) (picketing is form of free speech). None of these are claimed to be applicable to Petitioners' case.

broad-based support. *See Anderson v. Cele-brezze*, 460 U.S. 780, 788 & n. 9, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983) (noting that a state has an interest in ensuring elections are run fairly and honestly and that proposals are not submitted for enactment into law unless they have sufficient support); *see also Austin*, 994 F.2d at 297. As the court in *Dobrovolny* stated, "the difficulty of the process alone is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the circulation of petitions is not affected." *Dobrovolny*, 126 F.3d at 1113.

¶ 116 I conclude that section 20A–7–201(2)(a)(ii) does not preclude Petitioners from disseminating any political message nor does it prohibit the exchange of ideas. Rather, the statute establishes a numeric and geographic floor that must be reached before an idea is presented for a vote. Since no core political speech is infringed by the statute, Petitioners' argument that the statute unconstitutionally burdens their First Amendment free speech right is without merit.

### B. Equal Protection

¶ 117 Petitioners next argue that section 20A–7–201(2)(a)(ii) violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, state laws must "treat similarly situated people alike unless a reasonable basis exists for treating them differently." *State v. Lafferty*, 2001 UT 19, ¶ 70, 20 P.3d 342 (quotations and citations omitted).

The United States Supreme Court has stated that it will uphold a law against an equal protection challenge that neither burdens a fundamental right nor targets a suspect class so long as the legislative classification bears a rational relation to some independent and legitimate legislative end. *See Romer v. Evans*, 517 U.S. 620, 627, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996).

¶ 118 A statute creates impermissible or suspect classifications when it impacts "discrete and insular minorities," *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938), differently than the larger class of people affected by the statute. *See generally Malan v. Lewis*, 693 P.2d 661, 669–75 (Utah 1984). Petitioners argue that section 20A–7–201(2)(a)(ii) creates just such an impact on a discrete and insular minority group—urban dwellers. Petitioners, however, present inadequate support for this claim, nor have I been able to discover any authority for the proposition that urban dwellers represent a discrete and insular minority group worthy of suspect classification and constitutional protection. *Cf. Bowers*, 638 N.W.2d at 689 (noting that "Iowans who reside in counties with a relatively small population are not similarly situated to those who live in [larger counties]" and this was exactly why the legislature enacted a 10% signature requirement in all counties to get a bond on the ballot (citations and quotation omitted)).[4] Petitioners do argue that the United States Supreme Court has previously struck down laws based on a rural/urban distinction, and that therefore the United States Supreme Court has inferentially countenanced the inclusion of urban or rural dwellers within the rubric of

---

4. In *Bowers v. Polk County Bd. of Supervisors*, 638 N.W.2d 682, 689 (Iowa 2002), the petitioners argued that a statute which required sponsors of a bond to acquire signatures from 10% of the voters in each county in the last gubernatorial or presidential election within a ten-day period violated the Equal Protection Clause of the Iowa Constitution. The petitioners argued that voters in the more populous counties were treated differently from voters in less populous areas, because the ten-day time limit for obtaining signatures did not provide adequate time to collect signatures in the more populated counties. *See id.* at 689. In rejecting the challenge, the Iowa Supreme Court noted:

"Iowans who reside in counties with relatively small populations are not similarly situated to those who live in [more populous counties] for the purposes of this statute." We agree with the district court that to account for this variance in population is exactly why the legislature enacted the ten percent requirement, a requirement that applies to all counties. As the United States Supreme Court recognized, "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike."

638 N.W.2d at 689–90 (alterations in original) (citations omitted).

"suspect class." *See Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972); *Gordon v. Lance,* 403 U.S. 1, 4–5, 91 S.Ct. 1889, 1891, 29 L.Ed.2d 273 (1971); *Moore v. Ogilvie,* 394 U.S. 814, 818–19, 89 S.Ct. 1493, 1496, 23 L.Ed.2d 1 (1969). I, however, find these cases distinguishable.

¶ 119 In *Dunn,* for instance, the Supreme Court expressly stated that "durational residence laws must be measured by a strict equal protection test," and, after applying the strict test, struck down a Tennessee statute that both required residence for one year and eliminated the possibility of registering to vote 30 days prior to an election. 405 U.S. 330, 342, 360, 92 S.Ct. 995, 1003, 1012, 31 L.Ed.2d 274 (1972). Rather than determining that place of residence could be used to establish a suspect class, the Court decided the issue based on the right to vote. *Id.* at 341–42, 92 S.Ct. at 1002–03. Similarly, the Court in *Gordon* upheld a Virginia statute that provided that any attempt to incur public debt must be approved by 60% of the voters. 403 U.S. at 7–8, 91 S.Ct. at 1893. Admittedly, in the body of the opinion, the Court used the phrase " 'discrete and insular

minority,' " *id.* at 5, 91 S.Ct. at 1891, as well as "identifiable class," *id.* at 7, 91 S.Ct. at 1892, but the Court did not adopt a position that would support holding urban dwellers out as a protected class. Finally, in *Moore,* rather than identifying any discrete and insular minority, the Court struck down an Illinois law that they determined intruded upon the principle of "one man, one vote," a fundamental right raised in voting rights cases, because of the "rigid and arbitrary formula" used by the state. *Id.* at 818–19, 89 S.Ct. at 1496.[5]

¶ 120 Neither the majority nor the Petitioners have convinced me that the ability to attempt to change the law via the initiative process is entitled to the same protection as the right to vote. Nor can I find support for the proposition that the classifications created in section 20A–7–201(2)(a)(ii) implicate an impermissible or suspect classification under the Fourteenth Amendment.[6]

¶ 121 In the next part of their equal protection argument, Petitioners claim that section 20A–7–201(2)(a)(ii) violates their voting rights.[7] In support for this claim, Petition-

---

5. In this voting rights case, the formula required that persons seeking inclusion on the ballot as nontraditional candidates must submit a fixed number of registered voter signatures from a large number of counties. *See Moore v. Ogilvie,* 394 U.S. 814, 815, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969). The Court held that this formula, involving a fixed number without consideration for the population size of the various counties, was rigid and arbitrary, therefore violative of the Constitution. *See id.* at 818–19, 89 S.Ct. at 1496.

6. Additionally, the statute requires only that initiative supporters obtain signatures in 20 of the 29 Utah counties amounting to 10% of the total of all votes cast in that county for gubernatorial candidates in the last regular general election in which a governor was elected. Nowhere in the statute are initiative supporters directed to include certain counties nor are they mandated to ensure the participation of either rural or urban dwellers. Moreover, while it may be true that population figures are larger along the Wasatch front, it is not true that the people who make up this population can be fairly described as either urban or rural and, therefore, a "discrete and insular minority." Nor can it be safely asserted that the interests of the people who make up this purported group coincide or are even closely related. Without such evidence, it would be difficult, if not impossible, to characterize most

geographic areas of Utah as containing a "discrete and insular minority."

7. I am unconvinced by the reasoning underlying the decision of the majority to declare the people's right to legislate via the initiative process equal to the voting right and therefore fundamental. As it stands, the majority approach discusses the vital nature of fundamental constitutional rights and concludes, with little substantive discussion, that the ability to change the law through the initiative process is equal to the voting right and therefore fundamental. Admittedly, the majority proffers a number of cases to support this proposition, *see infra* ¶¶ 66–74. However, a close reading of these cases shows that they do not, in fact, support the majority's conclusion that the ability to change the law via the initiative is fundamental. *See infra,* dissent, note 20.

Outside of *Idaho Coalition United for Bears v. Cenarrusa,* Civ. No. 00–0668–S–BLW (D.Idaho Nov. 30, 2001), there is a dearth of authority to support the conclusion that a federal right to initiative exists or that the initiative process itself implicates a citizen's voting right under the federal Constitution. *See Meyer v. Grant,* 486 U.S. 414, 424, 108 S.Ct. 1886, 1893, 100 L.Ed.2d 425 (1988); *Save Palisade Fruitlands v. Todd,* 279 F.3d 1204, 1211 (10th Cir.2002); *Dobrovolny v. Moore,* 126 F.3d 1111, 1113 (8th Cir.1997); *Biddulph v. Mortham,* 89 F.3d 1491, 1500 (11th Cir.1996); *Taxpayers United for Assessment Cuts*

ers rely upon *Idaho Coalition United for Bears v. Cenarrusa,* Civ. No. 00–0668–S–BLW (D.Idaho Nov. 30, 2001).

¶ 122 In that case, the district court judge ruled unconstitutional a requirement in the Idaho Code that a petition contain signatures from six percent (6%) of qualified voters in 22 of 44 counties. *See id.* at 14. The court stated that "this Court must determine if the restriction is a 'severe' restriction on the right to vote ... [i]f the restriction is 'severe,' it may be upheld only if narrowly drawn to advance a compelling state interest." *Id.* at 7 (relying upon *Burdick,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)). The court rejected the argument that "there is no fundamental interest in placing measures, as opposed to candidates, on the ballot," *id.* at 9, and found that placing a measure on the ballot was entitled to the same protection as "disseminating ideas." *Id.* at 9–10 (quoting *Illinois State Bd. of Elections v. Socialist Workers,* 440 U.S. 173, 187, 99 S.Ct. 983, 991–92, 59 L.Ed.2d 230 (1979) ("[A]n election campaign is a means of disseminating ideas as well as attaining political office.")).

¶ 123 In essence, the United States District Court for the District of Idaho equated the ability to legislate through the initiative process with both the free speech right and the right to vote. The District Court's conclusion that the Idaho statute violated free speech is unpersuasive, for states may regulate the means by which measures get on the ballot as long as core political speech is not infringed. *See Dobrovolny,* 126 F.3d at 1113 (holding signature requirement to place initiative on ballot did not impinge upon speech); *Hoyle,* 59 F.Supp.2d at 836 (holding that a law requiring petition signers to be fully registered voters did not involve a restriction on core political speech).

¶ 124 The Idaho court's decision, equating the ability to place a matter on the ballot with the right to vote, is equally unpersuasive. In *Moore,* 394 U.S. at 818, 89 S.Ct. at 1495, the petitioners challenged on equal protection grounds the constitutionality of a statute that required nominating petitions for independent candidates to include signatures of 200 qualified voters from each of at least 50 of the state's 102 counties. The Court reasoned that "[t]he use of nominating petitions by independents to obtain a place on the ballot [was] an integral part of [the] elective system." *Id.* at 818, 89 S.Ct. at 1495. The Court further stated that "[a]ll procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgment of the right to vote." *Id.* at 818, 89 S.Ct. at 1495–96. The Court then concluded that the statute violated the Fourteenth Amendment as an abridgement of the right to vote. *See id.* at 819, 89 S.Ct. 1493.

¶ 125 Subsequently, in *Burdick,* the U.S. Supreme Court altered its position that merely because a law affects the election process it was "integral" to the process. In *Burdick* the Court stated:

Election laws will invariably impose some burden on individual voters. Each provision of a code, whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.... Accordingly, the mere fact that a State's system creates barriers ... tending to limit the field of candidates from which voters might choose, ... does not itself compel close scrutiny.

*Id.* (citations and quotations omitted).

¶ 126 The Court, therefore, abandoned the approach that all laws which impact the elec-

*v. Austin,* 994 F.2d 291, 294 (6th Cir.1993); *Bowers v. Polk County Bd. of Supervisors,* 638 N.W.2d 682, 692 (Iowa 2002). Prior to this decision, the ability to legislate through the initiative process has been subject to reasonable regulation, and has not triggered a declaration that the ability is either equal to the voting right or independently a fundamental right worthy of protection under a heightened scrutiny analysis.

tion process unconstitutionally impinge the right to vote. Thus, the Idaho court's reliance upon *Illinois State Bd. of Elections,* which adopts this absolutist approach, conflicts with the reasoning in *Burdick.*[8]

¶ 127 In the instant case, Petitioners rely upon *Moore* to support their claim that any law that affects the initiative process is a per se infringement upon the right to vote. However, in light of *Burdick,* this reasoning is flawed.

¶ 128 Other courts have agreed, concluding that limiting access to the ballot via the initiative process does not equate to restricting one's voting rights. For example, in *Massachusetts Pub. Interest Research Group,* 375 N.E.2d at 1181–82, the Massachusetts Supreme Court, performing almost exclusively a federal law analysis, addressed the constitutionality of a county-distribution rule that restricted the maximum number of petition signatures that could be utilized from any one county to qualify an initiative for the ballot. Opponents of the legislation claimed that it violated their federally protected voting rights. *Id.* at 1181. The court disagreed, and found that "[t]he county-distribution rule in no way affects the right of qualified voters to cast their votes for or against an initiative proposal properly on the ballot ... [nor does it] dilute any citizen's vote." *Id.* at 1181–82. The Tenth Circuit, also addressing an initiative issue, said

it could be argued that the appellant's fundamental right[ ] to vote [is] implicated within the broader right to bring an initiative, and that the power of initiative is therefore a fundamental right. However, nothing in the language of the [United States] Constitution commands direct democracy and we are aware of no authority supporting this argument. In fact, every decision of which we are aware has held that initiatives are state-created rights and are therefore not guaranteed by the U.S. Constitution.

*Todd,* 279 F.3d at 1210–11.

¶ 129 Moreover, a close reading of *Meyer* supports the conclusion that the United States Supreme Court has accepted the proposition that the ability to change the law via the initiative process is not a right granted either under the United States Constitution or implicated within the right to vote. *See Meyer,* 486 U.S. at 424, 108 S.Ct. 1886. Rather, the Court concluded that the initiative process is focused on the "discussion of public policy generally or advocacy of the passage or defeat of legislation." *Id.* at 428, 108 S.Ct. 1886; *see also Austin,* 994 F.2d at 296 (being unpersuaded that the signing of a petition to initiate legislation was entitled to the same protection as exercising the right to vote); *Hoyle,* 59 F.Supp.2d at 834, 838 (noting that signing a petition does not fall within the purview of the Voting Rights Act, and that there is no right under the federal constitution to have an initiative placed on the

---

**8.** The majority has chosen to follow *Moore* and not the more cautious and more recent approach used in *Burdick.* The majority ignores the fact that *Moore's* treatment of a voting rights claim represents an evolutionary dead end. "Even though election laws will invariably impose some burden on individual voters, not all restrictions on access to the ballot merit strict scrutiny." *Rockefeller v. Powers,* 74 F.3d 1367, 1378 (2d Cir.1996) (citations and quotations omitted). "To subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). The approach, as outlined in *Burdick,* requires a balancing of competing interest rather than an immediate application of strict scrutiny. There-

fore, the majority errs in failing to apply the standard set forth in *Burdick.*

Under *Burdick,* I would conclude the geographic distribution requirement is not severe, if for no other reason than the simple fact that Petitioners missed their goal by a mere 147 signatures. Moreover, since the recent amendment to section 20A–7–201(2)(a)(ii) two groups have successfully placed initiatives on the ballot. Petitioners have made no representation that any other group has failed to collect the sufficient number of signatures with the required geographic distribution.

It is also noteworthy that since deciding *Moore,* with the exception of *Illinois State Bd. of Elections v. Socialist Workers,* 440 U.S. 173, 187, 99 S.Ct. 983, 991–92, 59 L.Ed.2d 230 (1979), the United States Supreme Court has not cited *Moore* as controlling authority in any election or voting case, thereby reaffirming my belief that

ballot); *Kelly v. Macon–Bibb County Bd. of Elections*, 608 F.Supp. 1036, 1038 (M.D.Ga. 1985) (stating "This is *not* a 'right to vote' case; referendums, unlike general elections for a representative form of government, are not constitutionally compelled.").

¶ 130 I am persuaded by the reasoning of the cases cited above and agree that the ability to change the law via the initiative process is not equivalent to the right to vote. Were I to be persuaded by Petitioners' claim that section 20A–7–201(2)(a)(ii) implicates their right to vote, however, my conclusion today would not change. In their original petition for extraordinary writ, Petitioners asked that the court adopt the standard of review set forth in *Moore. See* 394 U.S. at 814, 89 S.Ct. at 1493. However, in its supplemental brief. Petitioners concede that the approach articulated in *Burdick*, 504 U.S. at 428, 112 S.Ct. at 2059, may be the more applicable guide.[9]

¶ 131 In *Burdick*, the Supreme Court acknowledged that "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." 504 U.S. at 433, 112 S.Ct. at 2063. The Court conceded that while the right to vote is of fundamental significance under the United States Constitution, it is erroneous to assume that all laws that impose a burden upon the right to vote are subject to strict scrutiny. *See id.* at 432–33, 112 S.Ct. at 2062–63. This conclusion constitutes a distinct departure from the Court's holding in *Moore*, for it acknowledges that not all election laws are considered "an integral part of the election process" subject to strict scrutiny.[10] 394 U.S. at 818, 89 S.Ct. at 1496; *see also Biddulph v. Mortham*, 89 F.3d 1491, 1500 (1996) (finding that a "state's

broad discretion in administering its initiative process is subject to strict scrutiny only in certain narrow circumstances."). The court in *Burdick* then adopted a "flexible standard" for reviewing election cases that requires courts to weigh the character and magnitude of the burden imposed against the State's justification for the burden. 504 U.S. at 434, 112 S.Ct. at 2063 (relying upon *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1569–70).

¶ 132 Even were I to assume that section 20A–7–201(2)(a)(ii) implicates Petitioners' voting right, which I do not, the burden imposed by section 20A–7–201(2)(a)(ii) is not severe enough to warrant a heightened level of scrutiny. Section 20A–7–201(2)(a)(ii) passes constitutional muster because it imposes only reasonable burdens on Petitioners.

¶ 133 Petitioners challenge the constitutionality of the geographic distribution requirement and assert that all geographic distributions are unconstitutional on their face. "A facial challenge to a legislative [statute] is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *Salerno*, 481 U.S. at 745, 107 S.Ct. at 2100. The fact that section 20A–7–201(2)(a)(ii) might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since the U.S. Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Id.*

¶ 134 Petitioners have failed to shoulder their heavy burden to demonstrate that section 20A–7–201(2)(a)(ii) is facially unconstitutional. *See id.* I am unpersuaded that no

---

*Burdick* is the proper statement of the law to be applied.

9. Petitioners acknowledge that "to avoid performing a strict scrutiny analysis [each] time a plaintiff complains that a state election law violates the First or Fourteenth Amendments, [the federal courts] have softened the test to require that a plaintiff show that her First or Fourteenth Amendment rights are subject to 'severe' or 'discriminatory' restrictions before strict scrutiny is triggered." Petitioners' Supplemental Brief at 18 n. 20.

10. For the same reason, it is misplaced for both Petitioners and the majority to rely upon such pre-*Burdick* cases as *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), where the Court struck down a "county-unit system" in which rural counties were given a disproportionate share of voting power in a primary as violating the Equal Protection Clause, and *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), which found that weighing the votes of citizens differently because of place of residence is not justified as support for its position that the geographic requirement of section 20A–7–201(2)(a)(ii) violates equal protection.

set of circumstances exist where a geographic distribution would be valid under the United States Constitution. Rather, I am persuaded by the fact that at least thirteen other states have created citizen initiative schemes that include a geographic distribution requirement.[11] Likewise, I also find persuasive the fact that other courts have reviewed geographic distribution requirements and have found them to be constitutional. *See Bowers,* 638 N.W.2d at 695; *Massachusetts Pub. Interest Research Group,* 375 N.E.2d at 1182. Having failed to discredit all possible geographic distribution schemes, Petitioners' equal protection argument fails.

¶ 135 Consequently, on its face, a geographic distribution requirement implicates neither federally recognized fundamental rights of free speech nor the right to vote. Nor does the requirement create distinctions based upon any previously recognized suspect classification. Therefore, if the statute is reasonably related to a legitimate government interest, I must conclude that it is not violative of the United States Constitution. *See Austin,* 994 F.2d at 297.

¶ 136 Here, the Respondents and the amicus curiae assert that requiring that initiatives have broad geographic support ensures that state-wide ballot initiatives are not controlled solely by highly populated areas with narrowly focused local interests. To address this concern, the legislature has required supporters to canvass the breadth of the State seeking support in multiple counties. *See* Utah Code Ann. § 20A–7–201(2)(a)(ii). It is within the range of legitimate government goals to ensure that initiatives placed on a ballot have been reviewed and agreed to by citizens from a broad range of geographic regions. *See generally Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (addressing filing fee requirements). A geographic distribution component is reasonably

related to achieving this goal. Thus, Petitioners' claim that all geographic distribution requirements violate the Equal Protection Clause of the Fourteenth Amendment is without merit.

¶ 137 I now consider Petitioners' claims pursuant to the Utah Constitution.

## II. STATE CONSTITUTIONAL ANALYSIS

¶ 138 Petitioners' remaining avenue for relief lies in their claim that Utah Code Ann. § 20A–7–201(2)(a)(ii) is facially unconstitutional under the Utah Constitution.[12] Petitioners argue that under the Utah Constitution, the people's sovereign right to enact legislation through the initiative process can never be subject to a geographic distribution requirement. Petitioners predicate their argument on two claims: (1) The statutory geographic distribution requirement violates the guarantees of free speech set forth in Article I, §§ 1 and 15; and (2) the geographic distribution requirement violates Article I, § 24 (the Uniform Operation of Laws Provision).

¶ 139 To support a facial challenge, Petitioners must establish that the challenged statute is invalid under *any* set of circumstances. *See State v. Herrera,* 1999 UT 64 at ¶ 4 n. 2, 993 P.2d 854. "Even if a court finds certain legislation unreasonable or unwise, that alone does not mean it has authority to invalidate it." *State v. Herrera,* 895 P.2d 359, 362 (Utah 1995).

> It is well settled in this state, as elsewhere, that the courts will not declare a statute unconstitutional unless it clearly and manifestly violates some provision of the Constitution of the state.... Every presumption must be indulged in favor of the constitutionality of an act, and every reasonable doubt resolved in favor of its

---

11. *See* Ark. Const. amend. 7; Fla. Const. art. XI, § 3; Mass. Const. Amend. art. 48, Gen. Prov., pt. 2; Miss. Const. Ann. art. 15, § 273; Mo. Const. art. 3, § 50; Mont. Const. art. III, § 4; Neb. Const. art. 3, § 2, Nev. Const. art. 19, § 2; Ohio Const. art. II, § 1a; Wyo. Const. art. 3, § 52; *see also* Alaska Stat. § 15.45.140 (2000); Fla. Stat. Ann. § 15.21 (West 2001); Idaho Code § 34–1805 (Michie 2001).

12. While the majority delves into a discussion of the statutes' signature removal provision, this provision is not challenged. In fact, in their supplemental brief, Petitioners specifically request that this court not address this issue and concede that it is, in all likelihood, constitutional. *See* Petitioners' Supplemental Brief, at 22.

validity .... If by any fair interpretation of the statute the legislation can be upheld, it is the duty of this court to sustain it, even though judges may view the act as inopportune or unwise; and it is not within the province of the judiciary to question the wisdom or the motives of the Legislature in the enactment of a statute.

*Baker v. Matheson*, 607 P.2d 233, 237 n. 2 (Utah 1979) (quoting *State v. Packer Corp.*, 77 Utah 500, 508–09, 297 P. 1013 (1931) (citations omitted)).

¶ 140 I also note that previously "[a]ll constitutional rights, including the highly protected right of free speech, [have been] subject to reasonable regulation." *Bott v. DeLand*, 922 P.2d 732, 743 (Utah 1996).[13]

¶ 141 Petitioners, while offering no independent support or analysis for their free speech claim under the Utah Constitution, argue that the protections afforded under Article I, §§ 1 and 15 are broader than the protections afforded by the First Amendment of the United States Constitution. Therefore, Petitioners continue the geographic distribution requirement violates their free speech rights under the Utah Constitution, or that the ability to legislate through the initiative process is a fundamental State constitutional right worthy of heightened protection.

### A. Freedom of Speech

¶ 142 In pertinent part, Article I, § 15 of the Utah Constitution states that "No law shall be passed to abridge or restrain the freedom of speech or of the press."[14] Free speech protection has been interpreted to guarantee that the government has no authority to restrict expression because of its message, its ideas, its subject matter, or its content. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1988).[15] The constitutional guarantee of free speech prevents any public authority from assuming a guardianship role of the public mind through regulating the press and speech. *See Riley v. National Fed'n of the Blind of N.C.*, 487 U.S. 781, 791, 108 S.Ct. 2667, 2674–75, 101 L.Ed.2d 669 (1988). At its core, the free speech protection establishes that the government, even with the purest of motives, cannot substitute its judgment as to the most appropriate method of communication available to both speakers and listeners. *See id.* It also forbids the government from directing the free and robust debate anticipated by the free speech provision. *See id.*

¶ 143 I see no reason to believe that Article I, § 15 provides any less protection than the First Amendment presumption that "speakers, not the government, know best both what they want to say and how to say it." *Id.*

¶ 144 Petitioners argue that by requiring supporters to demonstrate geographic support for an initiative before it can be placed on the ballot, the State has imposed a severe restriction on the free speech rights of Utah voters, as well as chilled the initiative sponsors' right to political expression. Utah Code Ann. § 20A–7–201(2)(a)(ii) states:

A person seeking to have an initiative submitted to a vote of the people for approval or rejection shall obtain:

...;

---

13. The majority relies upon *Cope v. Toronto*, 8 Utah 2d 255, 332 P.2d 977 (1958), as support for its claim that the people's ability to directly legislate through the initiative process is a fundamental right that the court must "defend against encroachment" and "maintain inviolate." *See supra* ¶ 27. The majority misapplies case law as well as the plain language of the Utah Constitution which states that the legislature may reasonably regulate the initiative process. *See* Utah Const. Art. VI, § 1. Furthermore, my reading of *Cope* does not support the majority's claim. While *Cope* does encourage liberal construction of the initiative process, the case itself only addresses the inequities of keeping initiatives off the ballot for "technical deficiencies."

14. Article I, § 1 of the Utah Constitution includes the phrase "to communicate freely their thoughts and opinions." This court, however, has concluded previously that Article I, § 15 provides a broader description than Article I, § 1 of the people's right to communicate freely. *See West v. Thomson Newspapers*, 872 P.2d 999, 1015 (Utah 1994). Therefore, I focus my analysis on Article I, § 15.

15. "[T]o the extent we cite federal authority, we do so only because we consider it persuasive to our independent construction of article I, section[] ... 15 of the Utah Constitution." *West*, 872 P.2d at 1018.

(ii) from each of at least 20 counties, legal signatures equal to 10% of the total of all votes cast in that county for all candidates for governor at the last regular general election at which a governor was elected.

The question then is whether this provision implicates either Petitioners' or the voters' right to free speech.

¶ 145 At its core, the statute requires initiative supporters to present to the lieutenant governor a sufficient number of signatures, from the required number of counties, before the initiative can be placed on the ballot. *See id.* With this threshold in mind, initiative supporters are free to approach any citizen within any, and ideally all, of the 29 Utah counties and freely discuss the initiative or any other subject without restriction from section 20A–7–201(2)(a)(ii). Moreover, Utah voters are equally free to voice their opinions concerning a proposed initiative, or concerning any other subject, with no restriction from section 20A–7–201(2)(a)(ii). Petitioners would have us determine that *any* geographic distinction that is not population equivalent would unconstitutionally burden the free speech necessary to the initiative right.

¶ 146 Free and robust public debate, however, can neither be equated with successfully communicating one's ideas, nor with successfully placing an initiative on the ballot, or with the proposal being adopted as law. Free and robust public debate is merely a means to achieve success or failure in the initiative process, not simply the result of successfully placing an initiative on the ballot. Although successfully placing an initiative on the ballot potentially sets the stage for public debate, there is no free speech right to place an initiative on the ballot. The free speech right simply protects Petitioners' right to engage in discourse that is essential to their attempt to place the measure on the ballot, as well as any further discussion that may occur in the process of their attempt to have the measure adopted.

¶ 147 Not only am I unable to agree with Petitioners that *any* geographic distribution requirement implicates either Petitioners', or the general populace's, right to free speech, I am also unable to conclude that the geo-graphic distribution requirement acts as a chilling force on the *free and robust public debate* protected by Article I, § 15.

### B. Uniform Operation of Laws

¶ 148 Next, Petitioners' claim that all geographic distribution requirements are violative of Article I, § 24 of the Utah Constitution, the State equal protection provision, which requires that "All laws of a general nature shall have uniform operation." This court has previously determined that "[w]hether a statute meets equal protection standards depends in the first instance upon the objectives of the statute and whether the classifications established [by the statute] provide a reasonable basis for promoting those objectives." *Malan,* 693 P.2d at 670. "For a law to be constitutional under Article I, § 24, it is not enough that it be uniform on its face. What is critical is that the *operation* of the law be uniform." *Lee v. Gaufin,* 867 P.2d 572, 577 (Utah 1993). This court has interpreted this to mean that "persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same." *Malan,* 693 P.2d at 669. Thus, to determine the validity of Petitioners' claim, it is necessary to decided whether a geographic distribution requirement operates uniformly and within constitutional parameters on all similarly situated persons. To satisfy this requirement, any geographic distribution requirement adopted by the State, at a minimum: (1) "must apply equally to all persons within a class" and (2) any statutory classifications created, and any resulting different treatment given the classes, "must be based on differences that have a reasonable tendency to further the objectives of the statute." *Id.* at 670.

¶ 149 "When persons are similarly situated, it is unconstitutional to single out one person or group of persons from among the larger class on the basis of a tenuous justification that has little or no merit." *Id.* at 671 (footnote omitted). Thus, when presented with a uniform operation of the laws challenge that does not involve an important or critical State constitutional right, the court

examines the statute to determine whether: (1) the classification created by the statute is reasonable, (2) the legislative objectives are legitimate, and (3) there is a reasonable relationship between the two. *See Ryan v. Gold Cross Servs., Inc.,* 903 P.2d 423, 426 (Utah 1995). Previously, the court has determined that "a statutory classification is constitutional unless it has no rational relationship to a legislatively stated purpose or, if not stated, to any reasonably conceivable legislative purpose." *Lee,* 867 P.2d at 580. Moreover, so long as the classification creates no invidious discrimination,[16] and is construed as having a rational relationship to the legitimate State purpose, the court is required to "presume that the classification was intended to further the legislative purpose." *Id.*

¶ 150 However, should a court conclude that a statute's classifications involve a critical state constitutional right or a suspect classification, then the court must employ a heightened standard of review. *See id.* at 581; *Peterson v. Coca–Cola USA,* 2002 UT 42, ¶ 23, 48 P.3d 941. Under those circumstances, a court may find that a statute does not violate the Constitution "only if it (1) is reasonable, (2) has more than a speculative tendency to further the legislative objective and, in fact, actually and substantially furthers a valid legislative purpose, and (3) is reasonably necessary to further a legitimate legislative goal." *Lee,* 867 P.2d at 583; *accord Ryan,* 903 P.2d at 428 (Stewart, J., concurring). But, the fact that the practical effect of a statute "subjects some persons to disparate treatment which is more oppressive than others must bear" does not create a

claim of constitutional dimension. *State v. Bell,* 785 P.2d 390, 398 (Utah 1989).

¶ 151 Petitioners argue that the State's geographic distribution requirement should be subject to heightened scrutiny, as established in *Lee,* because it not only involves a fundamental right, but it also creates " 'classifications considered impermissible or suspect in the abstract.' " *Peterson,* 2002 UT 42 at ¶ 23, 48 P.3d 941 (quoting *Ryan,* 903 P.2d at 426). Petitioners assert that the geographic distribution requirement establishes a discrete and insular minority group—urban dwellers. Petitioners, however, present no state constitutional support for this claim nor have I been able to discover any authority, in any jurisdiction, to support the proposition that urban dwellers have been recognized as a discrete and insular minority group. *Cf. Bowers,* 638 N.W.2d at 689.

¶ 152 Section 20A–7–201(2)(a)(ii), in its present form, does not distinguish between rural and urban dwellers. It requires only that initiative supporters obtain signatures from a variety of counties, clearly balanced to account for population differences. The statute does not mandate that initiative supporters obtain signatures from certain counties nor does it require supporters to obtain signatures from only urban or rural residents.

¶ 153 I am unwilling, at this time, to declare residents of either urban or rural counties as constituting an impermissible or suspect classification.

¶ 154 Petitioners next argue that the geographic distribution requirement embodied

---

16. In paragraphs 49, 54, 78, and 80, the majority makes the bold statement that the geographic distribution requirement is invidiously discriminatory. Black's Law Dictionary defines "invidious discrimination" as "arbitrary, irrational *and* not reasonably related to a legitimate purpose." Black's Law Dictionary, 826 (6th ed.1990) (citation and quotation omitted) (emphasis added). While there may be a question as to whether the distribution requirement is reasonably related to a legitimate governmental purpose, there is nothing to support the conclusion that the requirement is either irrational or arbitrary in this case. Such a conclusion would seem to ignore the 12 states that also have included a geographic distribution requirement within their initiative processes. *See infra* dissent note 19. Moreover, the small amount of evidence proffered during this

case supports just the opposite conclusion, that the requirement was the product of significant discussion on the part of the Legislature to satisfy certain concerns that today have been deemed insufficient by the majority. Invidious discrimination is not the same thing as a fundamentally different point of view. Rather, it is an unreasoned distinction with an intolerable consequence.

Finally, today's adoption of the urban/rural distinction may have widespread and far-reaching effects well beyond today's decision. I fear that future, benign legislation that makes reference to distinctions between urban and rural residents and their differing needs and concerns will be subject to attack as invidiously discriminatory.

within section 20A–7–201(2)(a)(ii) impacts the fundamental right of Utah citizens to seek changes to the law through the initiative process. Petitioners base this claim on Article VI, § 1(2) of the Utah Constitution.

> The catalog of fundamental interests is relatively small to date, and includes such things as the right to vote, to procreate[,] and to travel interstate.... A right or interest does not invoke strict [or heightened] scrutiny just because it is important to the aggrieved party. Only those rights that form an implicit part of the life of a free citizen in a free society can be called fundamental.

*Utah Pub. Employees' Ass'n v. State*, 610 P.2d 1272, 1273 (Utah 1980). When "interpreting the state constitution, [courts] look primarily to the language of the constitution itself .... Therefore, [the] starting point in interpreting a constitutional provision is the textual language itself.... [A court] need not inquire beyond the plain meaning of the [constitutional provision] unless [it] find[s] it ambiguous." *Grand County v. Emery County*, 2002 UT 57, ¶ 29, 450 Utah Adv. Rep. 21 (citations and quotations omitted); *see also Salt Lake City v. Ohms*, 881 P.2d 844, 850 (Utah 1994) (stating that " 'The rule which should be applied is that laws, and especially foundational laws such as our Constitution, should be interpreted and applied according to the plain import of their language as it would be understood by persons of ordinary intelligence and experience.' ") (citations omitted)). Thus, to properly perform this analysis, it is important to first determine whether the ability to pursue changes to Utah law, under the plain language of Article VI, § 1(2), and any prior interpretations of the provision, is an "implicit part of the life of

a free citizen in a free society." *Utah Pub. Employees' Ass'n*, 610 P.2d at 1273.

¶ 155 "The power to initiate legislation was reserved to the people of the State and to the people of any legal subdivision of the State by an amendment to the Constitution of Utah in 1900." *Dewey v. Doxey–Layton Realty Co.*, 3 Utah 2d 1, 277 P.2d 805, 806 (1954). Article VI, section 1(2) sets forth that:

> The Legislative power of the State shall be vested:
>
> ....
>
> In the people of the State of Utah, as hereinafter stated:
>
> The legal voters or such fractional part thereof, of the State of Utah as may be provided by law, under such conditions and in such manner and within such time as may be provided by law, may initiate any desired legislation and cause the same to be submitted to a vote of the people for approval or rejection ....

Utah Const. art. VI, § 1.[17]

¶ 156 This court has recently commented on this provision stating

> The Constitution has *vested in the legislature the power to prescribe the conditions, the manner, and the time that any desired legislation may be submitted to a vote of the people for approval or rejection.* ... It is axiomatic that laws enacted by the legislature are presumed to be constitutional and that the legislature is accorded wide latitude in complying with constitutional directives such as the one contained in article VI, section 1.

*Owens v. Hunt*, 882 P.2d 660, 661 (Utah 1994) (emphasis added).[18] This court has

---

17. The majority cites to constitutional provisions from other states to support its conclusion that the ability to attempt change through the initiative process is fundamental. Having reviewed the cited provisions, I would conclude that they are sufficiently different as to be inapplicable. Unlike Utah, the states cited by the majority have expressly limited the legislatures' ability to restrict the people's initiative right within the body of their constitutions. *See, e.g.,* Colo. Const. art. V, § 1(10) (2001) (establishing that the initiative right is self-executing under the Colorado constitution); Ore. Const. art. IV, § 1 (2001) (setting out, within the body of the constitution, the percentages of signatures required and only provid-

ing the legislature with the authority to "provide by law for the manner in which the Secretary of State shall determine whether a petition contains the required number of signatures"). Additionally, that the majority relies on constitutions other than our own to establish the fundamental nature of a Utah right is unpersuasive.

18. This court has addressed the initiative and referendum process in several other cases. *See Tobias v. South Jordan City Recorder*, 972 P.2d 373 (Utah 1998); *Citizen's Awareness Now v. Marakis*, 873 P.2d 1117 (Utah 1994); *Bigler v. Vernon*, 858 P.2d 1390 (Utah 1993); *Wilson v.*

also recognized limitations beyond the plain language of the Constitution. A voter's ability to initiate laws is restricted to proper legislative areas and away from areas specifically vested in an existing legislative body. *See Dewey*, 277 P.2d at 807; *see also Anderson v. Cook*, 102 Utah 265, 130 P.2d 278, 285 (1942) (concluding that even the constitutionally granted right to vote is subject to reasonable regulation).[19]

¶ 157 I conclude that the plain language of Article VI, § 1(2) is clear and unambiguous. While the ability *to attempt* to change Utah law through the initiative process is reserved to the legal voters of the State, this ability is expressly self-limiting. Article VI, § 1(2) establishes in the legislature the authority to reasonably limit the *numbers, conditions, manner, and time* within which the citizens may exercise this ability. Because of this limiting language within the Constitution, and while I acknowledge that the ability to pursue change through the initiative process is important, I conclude that the ability is not unfettered within the Constitution and, therefore, not subject to a heightened level of scrutiny.

¶ 158 Accordingly, I would apply the lower standard of review to section 20A-7-

201(2)(a)(ii) to determine whether: (1) any classification created by the statute is reasonable, (2) the legislative objectives are legitimate, and (3) there is a reasonable relationship between the two. *See Ryan*, 903 P.2d at 426. "[We should] keep in mind, however, that it is not [the court's] function to defend the merits, desirability, or rationality of legislative action. Rather, [the court's] function is to examine the reasonableness of the classification in light of legislative objectives." *Id.*

¶ 159 The first question, then, is to "determine precisely what classification is at issue," and whether that identified classification is reasonable. *Id.* Petitioners challenge the State's authority to enact any legislation that would require initiative supporters to demonstrate non-population based geographically distributed voter support before an initiative can be qualified for placement on the ballot.[20] This statutory requirement does not on its face create classifications. The court must therefore examine both the intent underlying the statute and the statute's impact. Petitioners assert that due to the concentration of Utah's population in four of the counties that make up the Wasatch front, the geographic distribution requirement vests

*Manning*, 657 P.2d 251 (Utah 1982); *Provo City v. Anderson*, 12 Utah 2d 417, 367 P.2d 457 (Utah 1961); *Revne v. Trade Comm'n*, 113 Utah 155, 192 P.2d 563 (Utah 1948); *Allan v. Rasmussen*, 101 Utah 33, 117 P.2d 287 (Utah 1941); *White v. Welling*, 89 Utah 335, 57 P.2d 703 (Utah 1936).

**19.** The majority concludes that the people's ability to initiate legislation is "coequal, coextensive and concurrent" with the power of the legislature. In making this statement, the majority relies on a concurring opinion, joined by no other member of the court, found in *Utah Power & Light v. Provo City*, 94 Utah 203, 74 P.2d 1191, 1205 (1937) (Larson, J., concurring). I am unpersuaded by the prose of the concurring opinion, and instead am convinced that the analysis adopted by the entire court in *Owens* is a more appropriate statement of the law. In *Owens*, we determined that the people's ability to change the law via the initiative process, as found in our Constitution, is an ability subject to reasonable limitations set by the legislature. *Owens v. Hunt*, 882 P.2d 660, 661 (Utah 1994).

Moreover, I do not think that *Shriver* supports the majority's conclusion that the ability to change the law via the initiative process is a fundamental right. Instead, I read *Shriver* to merely restate the language of Article VI, § 1. *See*

*Shriver v. Bench*, 6 Utah 2d 329, 313 P.2d 475, 476 n. 2 (1957). Furthermore, in *Shriver*, we stated that "the fundamental power of government is in the people, and the policy of the law generally is to regard it as being reserved to them *except as it may have been clearly declared otherwise.*" *Id.* at 332, 313 P.2d 475 (emphasis added). What was left unstated in *Shriver*, but is clear in both the language of our Constitution and *Owens*, is that while the ability to change the law via the initiative process is reserved to the people, the Legislature has the power to "prescribe [the number,] the conditions, the manner, and the time" surrounding the initiative process. *Owens*, 882 P.2d at 661.

For this reason, I am unpersuaded by the argument that the ability to change the law via the initiative process might be obliterated by excessive regulation. Any such regulation is limited by the plain language of the Utah Constitution, and our case law, to reasonable regulation of condition, manner, and time.

**20.** As presently enacted, section 20A-7-201(2)(a)(ii) requires initiative supporters to obtain signatures from 20 of Utah's 29 counties. However, because Petitioners challenge the geographic distribution statute on its face, I do not address the legislature's present requirement.

Utah's less populated counties with veto power over any proposed initiative.[21]

¶ 160 Assuming arguendo that Petitioners' contention is correct and that that a geographic distribution requirement results in voters in higher populated counties being treated differently than voters in less populated counties, I do not see this as fatal. In fact, I believe that the variance in population densities supports a reasonable legislative conclusion that voters residing in less populated counties *are not similarly situated* to the voters from more heavily populated counties. *See Bowers*, 638 N.W.2d at 690. Thus, because "persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same," *Malan*, 693 P.2d at 669, I conclude that the geographic distribution requirement is not necessarily an unreasonable or severe burden.

¶ 161 Moreover, I am not convinced that the distribution requirement creates the impact Petitioners allege. The geographic distribution requirement is based upon a mathematical formula. This formula is used to determine first the number of voters who cast a ballot in the last gubernatorial election in every Utah county, and then to determine the number of signatures that would satisfy the 10% requirement within each county. Sidestepping this needed information, Petitioners utilize *absolute population numbers* to make their argument. Petitioners fail to present any information concerning the number of voters who cast ballots in the last

gubernatorial election, the distribution of these voters in Utah, or the balance that may or may not be demonstrated through these figures. Petitioners have presented us with inadequate support for their argument that requiring a certain number of voters, representing a relatively wide geographic distribution, to sign an initiative petition before the initiative can be placed on the ballot is unreasonable.[22]

¶ 162 Therefore, I find nothing inherently irrational, *see Peterson*, 2002 UT 42 at ¶ 24, 48 P.3d 941, about the statutory geographic distribution scheme as a means to achieve widespread discussion and support when applied to the initiative process. *See Halgren v. Welling*, 91 Utah 16, 63 P.2d 550, 559 (1936) (analyzing Utah's statutory scheme surrounding the initiative process, including the then existing geographic distribution provision, without comment); *Zautra v. Miller*, 348 F.Supp. 847, 850 (D.Utah 1972)(concluding that Utah's scheme, requiring a candidate demonstrate support over a geographic distribution to qualify for placement on the ballot, was reasonable); *Bowers*, 638 N.W.2d at 689–90 (determining that the inherent differences between smaller and larger counties supported a conclusion that the groups were not similarly situated); *Massachusetts Pub. Interest Research Group*, 375 N.E.2d at 1183 (concluding that requiring initiative supporters to show support over a geographic distribution was reasonable).

21. The majority asserts that the geographic distribution requirement endows the rural counties with an "effective veto" over initiatives that enjoy support from the majority of Utah voters. This may indeed be true, but an equally effective veto power is held by what the majority has declared to be those subject to invidious discrimination—the four urban counties. These counties, apparently comprising 3/4 of Utah's population, can effectively veto any rural initiative through the requirement that an initiative garner support from 10% of the voters prior to qualifying for the ballot. Moreover, the concern regarding majoritarian rule is somewhat misplaced. As the United States Supreme Court has said, "Certainly any departure from the majority rule gives disproportionate power to the minority. But there is nothing in the language of the Constitution, our history, or our cases that require that a majority always prevail on every

issue." *Gordon v. Lance*, 403 U.S. 1, 6, 91 S.Ct. 1889, 1892, 29 L.Ed.2d 273 (1971).

22. Petitioners and the majority argue that the county distribution requirement creates a distinction between rural and urban voters. However, I am hard pressed to accept an argument that would require declaring St. George (approximate population 50,000) or Logan (approximate population 42,000) to be rural in nature, rather than urban, based purely on their existence within certain counties. By the same token, I would have a similar difficulty characterizing Magna or Spanish Fork, which both share a great number of rural characteristics, but are located within what Petitioners identify as urban counties. Finally, both Park City and Moab, each with very small year-round populations, defy characterization because both could reasonably be considered urban *and* rural in character.

¶ 163 The second question to be answered is whether the legislature's purpose in requiring initiative supporters to demonstrate statewide support for their initiatives is legitimate. This court should " 'sustain legislative action if [it] can reasonably conceive of facts which would justify the classifications made by the legislation.' " *Peterson*, 2002 UT 42 at ¶ 25, 48 P.3d 941 (quoting *Ryan*, 903 P.2d at 427 (citations omitted)). Thus, the court is not limited to the " 'purposes that can be plainly shown to have been held by some or all legislators.' " *Ryan*, 903 P.2d at 427 (quoting *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 641 (Utah 1989)). Here, however, much like in *Peterson*, the court has no need to impute a legitimate purpose, for at least one of several possible legislative purposes can be gleaned from examining the debate that surrounded the statute's 2000 amendment. At that time, Representative Garn stated

> There are two issues related to this house bill 304. The first is that this bill will assure [that] citizen's initiatives that go to the ballot are truly statewide issues and that is really one of the fundamental issues. If we're going to have initiatives on the ballot let's make sure that they are statewide issues.... If this law passes, you're still going to need 67,188 signatures. The difference is that we're increasing the distribution ... so by doing that we make sure the initiatives that go on the ballot are truly statewide initiatives.

*See* 52nd General Session of the Utah Legislature (February 17, 1998); Transcription of Floor Debate, House Bill 304.

¶ 164 It is also possible to discern a number of other legitimate purposes that may underlie this statement in support of the adoption of a geographic distribution requirement. Chief among these is a desire to facilitate a broader level of participation in discussing issues of statewide importance and to provide initiative supporters with a broader platform from which they can convey their message. Additionally, the require-

ment for support to be demonstrated over a geographic distribution could be motivated by a desire to avoid the appearance of matters of purely local interest on the statewide ballot that might occur if initiative supporters were permitted to garner 100% of the required signatures from one locality. Finally, the legislature may have intended to avoid the possibility of ballot clutter, where an issue is lost among competing initiatives and therefore not a focus of discussion. All have been recognized as legitimate goals in other locales.

¶ 165 In addition to acknowledging the broad range of possible legislative purposes, and noting that this is an issue of first impression, it is possible to look outside of the state for assistance in establishing the legitimacy of these identified, possible legislative purposes. To this end, I believe the analysis of *Bullock*, 405 U.S. 134, 92 S.Ct. 849, is persuasive. In *Bullock*, the United States Supreme Court stated

> the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections. Although we have no way of gauging the number of candidates who might enter primaries in Texas if access to the ballot were unimpeded by the large filing fees in question here, we are bound to respect the legitimate objectives of the State in avoiding overcrowded ballots. Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies.

405 U.S. at 145, 92 S.Ct. at 857 (footnote omitted). I conclude that the legislature may legitimately establish geographic distribution requirements for application to the initiative process to encourage wider debate, reduce ballot overcrowding, or ensure that initiatives are not focused solely on issues of local interest.[23]

---

23. Despite the existence of geographic distribution requirements enacted for similar reasons in twelve other states, and despite the acceptance of such reasons by the United States Supreme

Court, the majority has concluded that none of the purposes proffered by the appellees are legitimate. Then, after drawing this conclusion, the majority proceeds to determine that these "ille-

¶ 166 Finally, the analysis turns to a determination of whether the legislature has chosen a reasonable means to achieve its objective. *See Peterson*, 2002 UT 42 at ¶ 27, 48 P.3d 941. I would conclude that instituting a geographic distribution requirement within the initiative process is not an unreasonable choice to achieve one or more of the aforementioned possible legislative purposes.[24] While it may be possible to imagine alternative options that would have a different impact on the process, it is not this court's place " 'to defend the merits, desirability, or rationality of legislative action.' " *Id.* (quoting *Ryan*, 903 P.2d at 426). It is sufficient that the geographic distribution requirement is a reasonable and fairly debatable method to further conceivable legislative purposes.

¶ 167 Finally, were I to accept Petitioners' challenge as implicating a fundamental right under the state constitution, my conclusion would not change. As the parties acknowledge, the standard articulated in *Moore* has evolved over time into a more realistic approach. In *Burdick*, the United States Supreme Court determined that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest … would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433, 112 S.Ct. at 2063. Thus, the Court explained, when a challenge to a State election law is considered, a court is directed to

> weigh "the character and magnitude of the asserted injury to the rights … that the plaintiff seeks to vindicate" against "the precise interests put forward by the State

as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id.* at 434, 112 S.Ct. at 2063 (citations omitted). The Court then further refined the standard, adopting a sliding scale to apply to state election laws and instructing courts to examine whether a statute has been " 'narrowly drawn to advance a state interest of compelling importance' " *only if* the regulation is determined to create a " 'severe' restriction[ ]." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)). However, if the regulation creates "only 'reasonable, nondiscriminatory restrictions' … 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564).

¶ 168 Here, contrary to Petitioners' assertion, there is inadequate support for the conclusion that any geographic distribution requirement must always create a severe restriction on the people's ability to legislate through the initiative process. In the last general election, initiative supporters qualified two separate initiatives for inclusion on the ballot, each of which ultimately was approved by the voters. I am unable, therefore, to discern the severe impact that the geographic distribution requirement may have upon the people's ability to seek change through the initiative process. Accordingly, whether under *Burdick* or Utah's State Constitutional equal protection analysis, I conclude that " 'the State's important regulatory interests,' " *id.* (quoting

gitimate purposes" are not actually and substantially furthered by the geographic distribution requirement. I am unpersuaded by the analysis of the majority, and in fact believe it ill-advised to determine whether the legislative purpose is actually and substantially furthered by the geographic distribution requirement absent a developed factual record.

24. It is of no small moment that of the 23 states that have created a citizens initiative process, thirteen of them have instituted a geographic distribution requirement. More importantly, among these thirteen, ten states have concluded that the geographic distribution requirement is

*so important* to the process that they have constitutionalized the requirement. *See* Arkansas Const. amend. 7; Fla. Const. art. XI, § 3; Mass. Const. Amend. art. 48, Gen. Prov., pt. 2; Miss. Const. Ann. art. 15, § 273; Mo. Const. art. 3, § 50; Mont. Const. art. III, § 4; Neb. Const. art. 3, § 2; Nev. Const. art. 19, § 2; Ohio Const. art. II, § 1a; Wyo. Const. art. 3, § 52; *see also* Alaska Stat. § 15.45.140 (2000); Fla. Stat. Ann. § 15.21 (West 2001); Idaho Code § 34–1805 (Michie 2001). It would seem illogical to declare the geographic distribution requirement unreasonable in the face of such strong evidence of the central importance of such a limitation to so many other jurisdictions.

*Anderson,* 460 U.S. at 788, 103 S.Ct. 1564), are sufficient to justify the requirement.

## III. SEVERABILITY

¶ 169 Finally, I disagree with the conclusion that the geographic distribution requirement is severable from the body of the statute. Whether a portion of a statute is severable depends upon a determination of the legislature's intent in including the portion declared unconstitutional. *See Stewart v. Utah Pub. Serv. Comm'n,* 885 P.2d 759, 779 (Utah 1994). Central to this analysis is a need to "determin[e] whether the remaining sections, standing alone, will further the legislative purpose." *Id.* As we stated in an earlier case, "[t]he test fundamentally is whether the legislature would have passed the statute without the objectionable part, and whether or not the parts are so dependent upon each other that the court should conclude that the intention was that the statute be effective only in its entirety." *Union Trust Co. v. Simmons,* 116 Utah 422, 211 P.2d 190, 193 (1949). In *Stewart* we determined that the best measure of this lay in determining whether the offending subsection "has no necessary legal or practical effect upon the operation" of the statute. *Stewart,* 885 P.2d at 780.

¶ 170 My examination of section 20A–7–201(2) suggests that the geographic distribution requirement has both a legal and a practical effect on the law. Thus, subsection (2)(a)(ii) is not severable from the whole unless there is no circumstance under which such a requirement would survive a constitutional challenge. The majority, having stated that "[i]t is not inconceivable that a less restrictive, burdensome, or nondiscriminatory mechanism for ensuring broad geographic statewide support could be crafted," *supra* ¶ 49, have thereby established that a geographic distribution requirement may survive a constitutional challenge in at least one circumstance. Thus, it would be improper for this Court to find that the legislature could not have determined that a geographic distribution is integral to the legislative intent underlying the statute. Because subsection (2)(a)(ii) has a practical effect upon the operation of the initiative statute, which affects the balance struck between the various state interests, I do not believe that it is properly severable.

## CONCLUSION

¶ 171 A voter's ability to legislate through the initiative process is uniquely a state-created right that does not, in and of itself, implicate a fundamental right under the Constitution of the United States. It is a creature of state law that, if adopted, must comport with the First and Fourteenth Amendments of the United States Constitution. I conclude that the State geographic distribution plan satisfies this requirement.

¶ 172 The people's right to legislate through the initiative process, though important, is self-limiting under the plain language of the state constitution. As Article VI, section 1(2) sets forth:

> The Legislative power of the State shall be vested:
>
> . . . .
>
> In the people of the State of Utah, as hereinafter stated:
>
> The legal voters or such fractional part thereof, of the State of Utah as may be provided by law, *under such conditions and in such manner and within such time as may be provided by law,* may initiate any desired legislation and cause the same to be submitted to a vote of the people for approval or rejection . . . .

Utah Const. art. VI, § 1. Thus, the ability to pursue change through the initiative process is not unfettered and not properly the subject of heightened scrutiny.

¶ 173 Accordingly, following the analysis previously set forth in *Owens,* I would weigh limitations on the initiative ability for reasonableness, and, having done so, I would then hold that geographic distribution requirements are a reasonable exercise of legislative prerogative. As long as the legislature does not effectively foreclose the people's ability to seek change through the initiative process, the legislature may create reasonable regulations for the exercise of the ability. Thus, because the adoption of a geographic distribution requirement does not violate Article I, §§ 1, 15, or 24 of the Utah State Constitu-

tion, I would affirm the action of the Lieutenant Governor and deny Petitioners' request for writ.

¶ 174 Judge DAVIS concurs in Judge THORNE's dissenting opinion.

¶ 175 Having disqualified himself, Associate Chief Justice DURRANT does not participate herein, and Justice WILKINS does not participate herein; Court of Appeals Judges JAMES Z. DAVIS and WILLIAM A. THORNE sat.